**In the Matter of J.P. FYFE, INC. OF FLORIDA**

v.

**BRADCO SUPPLY CORPORATION, Appellant.**

No. 89–5182.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Oct. 3, 1989.

Decided Dec. 8, 1989.

Michael M. Rosenbaum, Donald P. Jacobs, Suzanne M. Klar, Budd Larner Gross Picillo, Rosenbaum Greenberg & Sade, P.C., Short Hills, N.J., for appellant.

Carol Ann Slocum, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Cherry Hill, N.J., for appellee.

Before SLOVITER, GREENBERG and ROSENN, Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

The bankruptcy Trustee for the estate of J.P. Fyfe, Inc., of Florida (FOF) filed a complaint to set aside a preferential payment by the debtor, FOF, to Bradco Supply Corporation (Bradco) under 11 U.S.C. § 547. The bankruptcy court found for the Trustee and the district court affirmed. Bradco appealed, contending that the Fyfe payment qualifies under the "saving provision" of 11 U.S.C. § 547(c)(2) as a non-preferential payment made in the "ordinary course of business." We affirm.

I.

The bankrupt, FOF, a roof installation company, had over a period of years purchased roofing materials from Bradco. Bradco also supplied roofing materials to J.P. Fyfe, a related New Jersey corporation (FNJ). The two J.P. Fyfe companies are hereinafter collectively referred to as "Fyfes."

Fyfes' original terms of payment to Bradco were sixty day net payment with a two percent discount if Fyfes made payments by the tenth of the second month following purchase. These payment terms were typical of the terms offered to other commercial roofing contractors.

By October 1985, Fyfes' debt to Bradco for materials approximated $500,000. At that time, John Delage, an officer of the Fyfes, met with Barry Segal, the owner of Bradco, and Donald Hollingsworth, Bradco's credit manager, to discuss alternative payment arrangements. After explaining

that Fyfes' bank had pulled their financing and that Fyfes had experienced problems on some jobs, Delage asked for ninety day payment terms rather than the present sixty days. Bradco agreed.

Fyfes did not, however, make any payment within the ninety day period. Thereafter, Delage and Hollingsworth again met to discuss the situation. Fyfes presented financial information which revealed that they had greater financial problems than Bradco had realized. Bradco initially told Fyfes that they would "cut off" deliveries to Fyfes. Bradco later relented when Fyfes stated that such action would jeopardize Fyfes' survival. Instead, the parties worked out a different payment arrangement.

After determining how much roofing materials Fyfes would need to complete their present jobs, Bradco offered to ship these materials provided Fyfes paid for these materials within sixty days. Bradco also agreed to defer Fyfes' past debt indefinitely.[1] Bradco claims Fyfes agreed to make monthly payments, with a maximum of $130,000 per month, which Bradco would apply against bills for the current monthly deliveries of roofing supplies. The Trustee, however, claims that, under the new plan, Fyfes were *required* to make three monthly payments of $130,000 to Bradco, beginning January 31, 1986, and ending March 31, 1986.

In November and December of 1985, Bradco issued invoices to FOF aggregating $150,064, together with $9,426.27 in service charges. During the same time period, Bradco invoiced FNJ for an aggregate of $84,644.91, together with service charges in December of $2,127.93. On January 31, 1986, FOF paid Bradco $100,000. Hollingsworth directed Bradco's bookkeeping department to apply $35,000 of the FOF payment to the account of FNJ and the remaining $65,000 to the account of FOF.

---

1. The record reveals that Bradco was willing to work out a payment arrangement on the $500,000 debt in conjunction with Allied Roofing Supply, to whom Fyfe also owed a large amount of money. Hollingsworth testified that Bradco told Fyfes "... to tell Allied that whatever plan they proposed, if it was reasonable, we would

cooperate with it, on a proportionate basis, knowing they were owed more money than we were...." Bradco apparently became impatient when no plan was forthcoming and suggested to Fyfes their own plan. However, no plan to pay off the old debt of $500,000 was ever finalized.

Hollingsworth claimed that he wasn't being "scientific" when he apportioned the $100,000 payment. Hollingsworth failed to inform Bradco's bookkeeping department of the arrangement to apply the payments to the November and December 1985 invoices and, as a consequence, Bradco's bookkeeping department, in keeping with its standard practice, credited the payments to the oldest invoice. Therefore, Bradco's bookkeeping department applied the payments to Fyfes' old debt of $500,000.

On February 28, 1986, FOF paid Bradco $130,000. In the same manner as he directed the January payment, Hollingsworth directed that $30,000 of the February payment be applied to the FNJ account and $100,000 to the FOF account. The bookkeeping department, however, again applied this payment against Fyfes' old debt of $500,000. Hollingsworth intended that both the January and February payments be applied to the invoices issued to the Fyfes in November and December 1985. On May 16, 1986, Fyfes filed a voluntary petition in bankruptcy.

## II.

The bankruptcy court found that Bradco had failed to prove that FOF made the payment of $130,000 "in the ordinary course of business." Although noting that FOF had intended that the January and February payments apply to the November and December invoices, the court emphasized that Bradco had set up its computers to apply incoming payments to the oldest invoices. The court stated "[the] [o]nly inference I can draw from that is that's the way it is usually done."

The bankruptcy judge found that Hollingsworth's testimony revealed that Bradco treated the Fyfes' accounts as special cases. The judge inferred from that testimony that Bradco went out of its way to keep the Fyfes "afloat." He noted that a smaller client would not have received the same generous treatment. The court also noted that, under the new arrangement, Bradco would no longer deal with Fyfe on an open account basis. Bradco had also informed Fyfes that it would file liens and notices in the event of nonpayment on the new shipments. The court found this new arrangement "was clearly intended to control the account to a greater extent than it had ever been controlled." Therefore, the court concluded that the $130,000 payment made to Bradco in February of 1986, did not qualify as a payment made "in the ordinary course of business" under subsection (c)(2) of section 547 and was avoidable as preferential transfer.

On appeal, the district court affirmed the bankruptcy court's determination that the February payment did not qualify under the ordinary course of business exception of Section 547(c)(2). 96 B.R. 474. The district court stated that the determination of what is "in the ordinary course of business" involved the application of a "subjective test;" the court must ask "whether 'the transfer [was] ordinary as between the debtor and the creditor?'" The court explained that under Section 547, the arrangement "need not have been common; it only need be ordinary. A transaction can be ordinary and still occur only occasionally."

Applying the above standard, the district court thought it significant that Bradco had "hammered" out its deal with FOF in conjunction with the efforts of a competitor. Bradco had told FOF that it would accept the same or similar terms for future dealings as Allied Roofing Products, one of FOF's major suppliers. The district court found there was no evidence that such criteria were within the past course of dealing between Bradco and FOF. The court also held that the deferment of Fyfes' half-million dollar debt, the imposition of a ceiling on their monthly purchases, and the treatment of their accounts as no longer open accounts demonstrated that the new arrangement and the subsequent payments were not made in the ordinary course of business. Although acknowledging that Bradco's actions "were taken in a good-faith attempt to avoid 'killing the golden goose' of appellee's business," the court concluded that section 547(c)(2) did not "grant awards for such attempts—it only

protects normal, customary business dealings.''

On appeal, Bradco claims that the district court erred in disqualifying the $130,000 February payment by FOF as a preferential payment under section 547(c)(2) and abused its discretion by affirming the bankruptcy court's imposition of prejudgment interest. Because Bradco did not raise the prejudgment interest issue in the district court,[2] we only consider the issue of whether the disputed payment qualifies as a payment made in the ordinary course of business under 11 U.S.C. § 547(c)(2).

## III.

In reviewing this appeal, we first examine the district court's review of the bankruptcy court's decision to determine if the district court employed the proper standards of review. The district court may set aside the bankruptcy court's factual findings only if the findings are clearly erroneous. *See* Bankr.Rule 8013. The bankruptcy court's legal conclusions, however, are subject to the district court's plenary review. *Universal Minerals Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981). Employing the same standards of review as does the district court, we review the bankruptcy court's findings and conclusions of law to determine whether the district court erred in its application of the proper standards of review. *See Resyn Corp. v. United States*, 851 F.2d 660, 664 (3d Cir.1988).

The Trustee and Bradco stipulated below that the payment at issue qualifies as a preferential transfer under 11 U.S.C.

§ 547(b).[3] The Trustee is therefore entitled to set aside the transfer unless it falls "within one of the statutory safe harbors for otherwise preferential transfers." *In re Jet Florida Sys., Inc.*, 861 F.2d 1555, 1557–58 (11th Cir.1988). Bradco claims, however, that it finds such safe harbor in the exception contained in section 547(c)(2). Section 547(c)(2) provides in pertinent part:

(c) The trustee may not avoid under this section a transfer—

\*    \*    \*    \*    \*    \*

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business ... affairs of the debtor and the transferee;

(B) made in the ordinary course of business ... of the debtor and the transferee; and

(C) made according to ordinary business terms;

\*    \*    \*    \*    \*    \*

For a payment to qualify under the exception of subsection (c)(2) of section 547 and to render the transfer nonavoidable, a creditor must prove by a preponderance of the evidence the three statutory conjunctive elements. First, the creditor must show that the debtor incurred the underlying debt in the ordinary course of business of the debtor and the transferee. Both parties here agree that the underlying debt meets this requirement. Second, the creditor must show that the debtor made the transfer in the ordinary course of business or financial affairs of the debtor and the

**2.** *See Resyn Corp. v. United States*, 851 F.2d 660, 664 (3d Cir.1988), *citing, Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (As a general rule, "a federal appellate court does not consider an issue not passed upon below.").

**3.** Section 547(b) of the Bankruptcy Code provides in pertinent part:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition ...
\*    \*    \*    \*    \*    \*
(5) that enables the such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

transferee. Finally, the creditor must show, that the payment was made according to ordinary business terms. *WJM, Inc. v. Massachusetts Dep't of Pub. Welfare,* 840 F.2d 996, 1010–11 (1st Cir.1988). We focus on whether the district court erred in affirming the bankruptcys' determination of the second and third elements of § 547(c)(2).

Whether or not a debtor made a particular payment in the ordinary course of business is a factual determination which a reviewing court should not set aside unless it is clearly erroneous. *Braniff Airways, Inc. v. Midwest Corp.,* 873 F.2d 805, 806 (5th Cir.1989); *In re Jet Florida Sys., Inc.,* 861 F.2d 1555, 1560 (11th Cir.1988). As other courts have "lamented," Congress has failed to define its understanding of the term "ordinary." *WJM, supra,* 840 F.2d at 1010; *accord In re Magic Circle Energy Corp.,* 64 B.R. 269, 272 (Bankr.W. D.Okla.1986); *In re Bourgeois,* 58 B.R. 657, 658–59 (Bankr.W.D.La.1986). The scanty legislative history of this section reveals only that "[t]he purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted* in 1978 U.S.Code Cong. & Admin.News 5787, 5874. Congress has apparently left to the courts the task of defining "normal financing relations."

In determining what was the ordinary course of business between the debtor and Bradco, the district court emphasized the bankruptcy court's finding that Bradco had changed Fyfes' payment terms. The district court referred to the bankruptcy court's determination that Bradco's agreement "constituted a 'new deal' between the parties, one which imposed terms and constraints not previously present between the parties, ... as a direct result of Bradco's knowledge of ... [the debtor's] deteriorating financial condition." The court particularly noted that under this arrangement, Bradco would cease supplying the debtor upon default by the debtor as contrasted with the previous open account basis under which the account would not be closed simply because of an outstanding indebtedness. The court concluded that Bradco had instituted a previously unknown degree of control over Fyfes' business activities, which took the new arrangement outside the ordinary course of business.

Bradco strenuously contends that the new payment terms to which it agreed with Fyfes were consistent with the statute and were in the ordinary course of business. It argues that:

> By agreeing to freeze the $500,000 indebtedness and to continue to do business with the Fyfe companies on current payment terms, Bradco was not attempting to gain an advantage over other creditors. This was not a situation in which the creditor accelerated its collection procedures in order to be paid first.... On the contrary, all other creditors *benefited* from the actions of Bradco, which enabled the Fyfe companies to continue performing work on construction jobs in progress. The revenues collected by the Fyfe companies from the completion of that work were for the benefit of all creditors, not just Bradco.

Unfortunately for Bradco, not all the facts found by the district court and the bankruptcy court support this argument. Although a careful examination of the record supports Bradco's contention that the $130,000 payment was merely an approximation of the anticipated monthly purchases by Fyfes,[4] we will not tarry on an

---

4. Hollingsworth, Bradco's credit manager, testified:

> We told him that we would set aside for purposes of payment, the bill that was owed as of October 31st and we would start, as of November 1st, whatever goods we shipped him, were to be paid again, within standard terms.

. . . . .

> And, whatever you purchase in November, the[y] would then be due the end of January and we asked him approximately how much he would need during those period of times and we estimated approximately $120,000 to $130,000 per months would cover him.
> So, we set a ceiling of $130,000 a month....

analytical discussion of the pertinent testimony on this issue because we believe Bradco fails to achieve the safe harbor exception and founders on a reef it ventured to cross. On October 22, 1985, Bradco wrote John Delage of Fyfe that under the new plan it would file on a selected basis preliminary notices of non-payment to the owners (of properties under construction) to enable Bradco to ultimately obtain liens under the Florida Mechanics Lien Statute for materials sold for these projects. As Hollingsworth acknowledged under cross-examination, prior to November 1985, Bradco did not utilize the preliminary lien procedure in connection with Fyfes' debt. Utilization of the lien procedures would give Bradco "something to fall back on if he reneged." It would give Bradco "partial lien rights, some lien rights...."

■ The district court was unclear in its opinion as to whether it found specifically that the ingestion into the new financial arrangements of the preliminary lien procedures constituted a measure not in the ordinary course of business. It did find that "the arrangements of October 22nd and February 5th, and the payment of the $130,000 was not in the ordinary course of business between the parties." [5] We construe this as a finding, *inter alia*, that the lien procedures set forth in the letter of October 22 were not in the ordinary course of business. The record establishes such a finding. According to Hollingsworth, Bradco and Fyfes had in the past conducted business on an open account basis. It had never tracked Fyfes' construction projects in the past as it was doing under the new plan of payment and it had not previously filed Notice to Owners to enable Bradco to obtain liens for materials sold Fyfes.

This variation from the parties' normal course of doing business is significant. Under Florida law, no lien on improved real property can be perfected in the absence of valid service of a Notice to Owner. *Peninsular Supply Co. v. C.B. Day Realty, Inc.*, 423 So.2d 500, 502 (Fla. 3d Dist.Ct.App. 1982). Bradco possessed detailed knowledge of FOF's deteriorating financial condition. Based on this knowledge, a new agreement was worked out whereby Bradco could file Notices to Owners and, in essence, obtain a head start in securing its claims.

Whether any such head start resulted is not our concern. Neither will we consider whether Bradco benefited from the new terms of the agreement or whether creditors were prejudiced. Under section 547(c)(2), in determining if the FOF payment was made in the ordinary course of business, the district court had to analyze only the context of FOF's and Bradco's business relationship. *See* 11 U.S.C. § 547(c)(2).

We have also not discovered any evidence from which it can be found that it was the ordinary course of business between the parties to determine in advance the amount of the monthly payment to be made by the debtor. There was no prior practice to apply a portion of the debtor's payment to the account of FNJ, or to suspend the payment of an old debt and apply new payments to current invoices.

### IV.

Under subsection (g) of section 547, Bradco had the burden of proving the nonavoidability of a transfer under subsection (c) of section 547. In light of the failure of Bradco to establish that the new workout

---

On the other hand, the Trustee refers us to other ambiguous statements in the record from which it concludes that the agreement to pay was for a fixed sum of $130,000 per month without regard to the amount of supplies purchased and that the sums paid by Fyfes were allocated to their respective accounts without regard to the materials each of them invoiced for the month.

**5.** There are different views among the courts as to whether the test of what constitutes "ordinary

business terms" is determined by looking to the relevant industry standards or to the terms and practices normally employed by the debtor and creditor. *See In re Steel Improvement Co.*, 79 B.R. 681, 683–85 (Bankr.E.D.Mich.1987) (discussing majority and minority viewpoints). The district court here apparently looked to "the course of business between the parties" with which we do not disagree.

arrangement complied with the ordinary course of business exception carved out by 11 U.S.C. § 547(c)(2), we conclude that it was not clearly erroneous for the district court to find that the payment of $130,000 to Bradco on February 28, 1986, was not made within the ordinary course of business between the parties. This payment is therefore avoidable as a preferential transfer under 11 U.S.C. § 547(b).

Accordingly, the judgment of the district court will be affirmed.