In the Matter of DELAWARE & HUDSON RAILWAY CO., Debtor.

The NEW YORK, SUSQUEHANNA & WESTERN RAILWAY CORP.,
Plaintiff/Appellee,

v.

RAILWAY LABOR EXECUTIVES' ASSOCIATION and United
Transportation Union,
Defendant/Appellant.

Civ. A. No. 89–279–JJF.
Bankruptcy No. 88–342.

United States District Court,
D. Delaware.

Nov. 8, 1990.

John O'B. Clarke, Jr. and L. Pat Wynns, of Highsaw Mahoney & Clarke, Washington, D.C., Anne Bookout Horgan, of Lassen Smith Katzenstein & Furlow, Wilmington, Del., for Railway Labor Executives' Ass'n, and United Transportation Union.

Stanley J. Samorajczyk, Thomas C. Junker, and Linda S. Broyhill, of Hazel Thomas Fiske Beckhorn & Hanes, Charles H. White, Jr. and Clifford A. Godiner, of Peper Martin Jensen Maichel & Hetlage, Washington, D.C., Eduard F. von Wettberg, III and Joanne B. Wills, of Morris James Hitchens & Williams, Wilmington, Del., for Francis P. DiCello, trustee, Delaware & Hudson Ry. Co.

William P. Quinn and Eric M. Hocky of Rubin Quinn Moss & Heaney, Philadelphia, Pa., James W. Owen, of Williams Gordon & Martin, Wilmington, Del., for The New York, Susquehanna & Western Ry. Corp.

### OPINION

FARNAN, District Judge.

Two separate but factually related cases have been brought by the Railway Labor Executives' Association ("RLEA"). The first case is an action for declaratory judgment and injunction, captioned *Railway Labor Executives' Association v. DiCello, Trustee,* Civil Action 89–169 (hereinafter "the declaratory judgment action"); the second case is an appeal from a decision of the United States Bankruptcy Court for the District of Delaware, captioned *In Re Delaware & Hudson Railway Co.,* Civil Action 89–279 (hereinafter "the bankruptcy appeal"). By Order dated August 28, 1989, the Court stayed the declaratory judgment action pending resolution of the bankruptcy appeal. This Opinion concerns the bankruptcy appeal.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Both actions involve a Memorandum of Understanding ("Memorandum") entered into by the Trustee in Bankruptcy of the Delaware and Hudson Railway Company ("Trustee" and "D & H" respectively) and the New York, Susquehanna and Western Railway Corporation ("NYS & W"). D & H filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on June 20, 1988, and the Trustee was appointed on June 27, 1988. By Orders dated June 22 and 23, 1989, the Interstate Commerce Commission ("ICC"), pursuant to 49 U.S.C. § 11125, authorized NYS & W to operate D & H's lines as directed service carrier through February 13, 1989. Prior to the February 13 expiration date, the Trustee determined that D & H did not possess the resources to resume operation on February 13, and therefore the Trustee and NYS & W entered into the Memorandum at issue. The Memorandum provides, in pertinent part, that operation after February 13, 1989, shall be pursuant to 49 U.S.C. § 11123, under either existing NYS & W work rules, wage and crew consist agreements or pursuant to implementing agreements with D & H labor organizations deemed necessary by NYS & W that include two-man crews on road freight assignments, elimination of engine cuts, reduction of positions, cross-training for furloughed workers, and certain benefits.

On February 7, 1989, the Trustee requested that the Bankruptcy Court approve the terms and conditions of the Memorandum. At a hearing on the Trustee's request, RLEA, an unincorporated association of chief executives of labor organizations representing most of the organized rail employees in the country, argued that (1) the Memorandum altered wages and working conditions of D & H employees established by collective bargaining agreements in violation of notice, negotiation and status quo provisions of Section 6 of the Railway Labor Act, and (2) the Bankruptcy Court's approval of the Memorandum would contravene Section 1167 of the Bankruptcy Code.

On February 9, 1989, the Bankruptcy Court approved the Memorandum, subject to the ICC incorporating the Memorandum into an order authorizing continued operation of the D & H lines by NYS & W. RLEA appealed the Bankruptcy Court's order on February 21. On March 15, the ICC authorized NYS & W to operate the D & H lines as emergency service carrier but the ICC order did not incorporate the terms and conditions of the Memorandum. In declining to incorporate the Memorandum into its order, the ICC gave as its rationale that it (the ICC) was concerned only with the transportation aspects of the D & H situation, which it saw as the extent of its statutory authority under the Interstate Commerce Act. Appendix of RLEA and UTU at A133. The ICC did not see itself as statutorily authorized to decide the wages and working conditions of the D & H employees.

In light of the ICC's March 15, 1989 decision not to incorporate the Memorandum into the Service Order, RLEA agreed

to a remand to Bankruptcy Court of its then pending appeal of the Bankruptcy Court's February 9 order, so that the Bankruptcy Court could reconsider its February 9 decision to approve the Memorandum. The Trustee sought to have the Bankruptcy Court amend the February 9 order to confirm the effectiveness of the Memorandum, notwithstanding that the ICC's order did not incorporate it.

On April 10, 1989, RLEA and UTU filed their declaratory judgment action against the Trustee and NYS & W. in United States District Court for the District of Delaware. On April 18, 1989, RLEA filed an amended complaint in the declaratory judgment action, alleging (1) that the Trustee violated Sections 2 First, 2 Seventh, and 6 of the Railway Labor Act by entering into the Memorandum, and (2) that the Trustee and NYS & W conspired to violate the same provision of the Act. The amended complaint sought a declaratory judgment that the Act requires the Trustee to give notice and negotiate before changing wage and working conditions of D & H employees and an injunction that enjoins the Trustee and NYS & H from making such changes until they comply with the Act.

On May 2, 1989, the Bankruptcy Court entered an amended order confirming the terms and conditions of the Memorandum. On May 3, 1989, RLEA noticed the instant appeal of the May 2 order, arguing that it violated 11 U.S.C. § 1167 by approving an agreement that permits unilateral changes to wage and working conditions established by collective bargaining. The Bankruptcy Court's legal conclusions are subject to plenary review in the District Court, *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir.1989) (citation omitted), however, the standard of review of the Bankruptcy Court's findings of fact will not be set aside unless clearly erroneous. Bank.Rule 8013.

## II. ISSUES

In this appeal, RLEA contends that Section 1167 of the Bankruptcy Code prohibited the Bankruptcy Court from approving the Memorandum of Understanding ("Memorandum") between the Trustee and NYS & W, because it changed rates of pay of D & H employees without first complying with Section 6 of the Railway Labor Act ("RLA").

RLEA and the UTU also contend that Section 11123 of the Bankruptcy Code does not supersede the Trustee and Bankruptcy Court's obligation to refrain from altering wages without first complying with Section 6 of the RLA.

In response, the Trustee argues, as the Bankruptcy Court held, that the Trustee did not change the wages and working conditions of D & H employees in violation of Section 6 of the RLA. The Trustee contends that while wages and working conditions were changed, there was no need to comply with Section 6 of the RLA because the changes in employment conditions were not made by the Trustee as de facto employer of the D & H employees, but were made by NYS & W as emergency service carrier pursuant to Section 11123, which permits the emergency service carrier to set the terms of compensation with the debtor carrier whose lines are being taken over by the emergency service carrier.

The Trustee contends that the Memorandum is just such a compensation agreement between carriers pursuant to Section 11123, and that it is not an attempt by the Trustee to circumvent the notice and bargaining provisions of Section 6 of the RLA because Section 6 is inapplicable to emergency service situations. While the Memorandum was entered into before NYS & W was selected as emergency service carrier by the ICC, it was adopted in the event that NYS & W was so selected and if NYS & W was not selected, the Memorandum would have had no effect. Thus, the Trustee argues no Section 6 notice and bargaining was required.

## III. DISCUSSION

11 U.S.C. Section 1167 provides:

[N]either the court nor the trustee may change the wages or working conditions of the employees of the debtor established by a collective bargaining agree-

ment that is subject to the Railway Labor Act (45 U.S.C. § 151 *et seq.*) except in accordance with Section 6 of such Act (45 U.S.C. § 156).

Section 6 of the RLA requires that a carrier give thirty days written notice of an intended change in working conditions, rules or rates of pay, and also requires that a conference between the representatives of the parties be held within that thirty day period.

Thus, the pivotal issue on this appeal is whether the findings of the Bankruptcy Court with regard to its decision that the Memorandum of Understanding did not change wages or working conditions of the D & H employees in violation of Section 6 of the RLA are clearly erroneous.

## A. *The Memorandum Of Understanding Entered Into By The Trustee Did Not Change Wages And Conditions.*

The Court concludes that the findings of the Bankruptcy Court with regard to whether the Memorandum entered into by the Trustee changed wages and working conditions without first complying with Section 6 of the RLA, were not clearly erroneous. The Bankruptcy Court found that it was the ICC order dated February 13, 1989 that authorized NYS & W to operate D & H's lines as emergency service carrier under Section 11123. The Memorandum was entered into between the trustee and NYS & W *in the event that* NYS & W was selected as emergency service carrier and if NYS & W was not selected, the Memorandum would have no effect.

As the Bankruptcy Court found, the wages and working conditions of the former D & H employees were changed, not by the Memorandum, but by the introduction of NYS & W as emergency service carrier under § 11123. The Memorandum was simply an agreement to set wages *if* a certain contingency took place (i.e., NYS & W being named emergency service carrier). This finding is also supported by the fact that the Memorandum was conditioned on the ICC finding an emergency situation

and naming NYS & W to fill the void. The D & H collective bargaining agreements are, as the appellees correctly point out, still intact, and will be utilized if the trustee ever retakes control of the D & H, allowing D & H to once again become the employer.

In addition, it is clear that even without the Memorandum, changes similar to those resulting from the Memorandum would have occurred anyway. NYS & W was not willing to operate the D & H lines as emergency service carrier under directed service rules which required the acceptance of D & H's collective bargaining agreements, and it was not required by law to do so.

The Bankruptcy Court correctly found that under Section 11123 NYS & W was permitted to change wages and working conditions because the former D & H employees were now employees of NYS & W. Specifically, Section 11123(a)(1)(B) states that the ICC may "take action during the emergency to promote service in the interest of the public and of commerce ... *on terms of compensation the carriers establish between themselves.*" The emergency service carrier is not required to adopt the debtor carrier's collective bargaining agreements.

RLEA and UTU contend that NYS & W is *required* under Section 11123 to hire the former D & H employees at the same terms and conditions of employment as they were working under when they were D & H employees. The Court finds untenable RLEA and UTU's argument that because Section 11123 "clearly contemplates 'joint' use of lines ... [it] thus presupposes no change of agreement rights of the employees of the carrier over which the carrier is being authorized to operate jointly." [1] As stated above, the Bankruptcy Court properly concluded this to be an erroneous interpretation of Section 11123(a)(1)(B), which clearly states that in an emergency service situation, the carriers are permitted to establish the wages and working conditions between themselves.

**1.** Opening Brief of Appellants RLEA and UTU at 30.

In asserting that Section 11123 requires the emergency service carrier to adopt the debtor carrier's collective bargaining agreements, RLEA and UTU ignore the clear difference in statutory language between directed service under Section 11125 and emergency service under Section 11123.

B. *The Relationship Between § 6 Of The RLA And Emergency Service Under § 11123.*

By way of their second argument, RLEA and UTU contend that the ICC emergency service order under § 11123 does not conflict with nor supersede the Trustee and the Bankruptcy Court's obligation not to change wages and working conditions except in conformity with Section 6 of the RLA.

RLEA and UTU base their contention on the incorrect assumption that the Trustee, by entering into the Memorandum, abrogated the collective bargaining agreements of the D & H employees. As discussed above, the Trustee passed no operating authority to NYS & W, and did not abrogate the collective bargaining agreements. The collective bargaining agreements are still in place and will become operational again if the Trustee is ever able to regain financial control of the D & H's lines from NYS & W.

In concluding that Section 6 notice and bargaining was not required in the instant case, the Court finds *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R. Co.* (hereinafter "P & LE"), relied upon by RLEA in its arguments to the Bankruptcy Court and the ICC, to be instructive. 845 F.2d 420 (3d Cir.1988), *rev'd*, —— U.S. ——, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989).

In *P & LE*, a financially ailing railroad, the Pittsburgh & Lake Erie Railroad announced the sale of its assets to a newly formed subsidiary of another carrier, P & LE Rail Company ("Railco"), in an attempt to solve its financial problems. When the sale was announced, Railco stated that it

would not assume the collective bargaining agreements in effect between Pittsburgh & Lake Erie Railroad and its union, and that it would only hire approximately 250 of Pittsburgh & Lake Erie Railroad's 750 employees. *See P & LE*, 109 S.Ct. at 2988. RLEA asserted that because the sale would have an effect on the wages and working conditions of Pittsburgh & Lake Erie Railroad employees, Pittsburgh & Lake Erie Railroad could not effectuate the sale without first complying with the mandatory notice and bargaining provisions of Section 6 of the RLA. *Id.* at 2588–89.

Pittsburgh & Lake Erie Railroad, on the other hand, argued that Section 6 of the RLA was irreconcilable with Section 10901 of the Interstate Commerce Act [2] which gives the ICC exclusive jurisdiction over approving acquisitions of railroads, thus, no Section 6 notice was required.

The United States Supreme Court held that Pittsburgh & Lake Erie Railroad did not have to comply with Section 6 of the RLA before selling its assets, even though there was arguably a change in the wages and working conditions of employees. *Id.* at 2593. The Supreme Court based its decision on the failure of RLEA to indicate a specific provision of the collective bargaining agreements which was being changed. *Id.* at 2592–93. In fact, the Supreme Court found persuasive the Third Circuit's statement that the collective bargaining agreements did not seem to contemplate such an occurrence (i.e., sale of rail line). *Id.* at 2593 n. 14.

The same could be said for the instant case. RLEA and UTU do not point to any specific provisions of the collective bargaining agreements which are being changed, other than arguing generically that wages and working conditions are being affected.[3] Further, the collective bargaining agreements do not seem to contemplate D & H's bankruptcy and the consequences of appointment of an emergency service carrier.

The Court is persuaded that the transfer of operation of D & H's lines to NYS & W

---

**2.** 49 U.S.C. §§ 10901(a), 11343(a) (Supp.1990).

**3.** Opening Brief of Appellants RLEA and UTU, *passim.*

is akin to a sale of assets as discussed in *P & LE* and for which no Section 6 notice is required. Since RLEA and UTU cannot point to any specific provision in the relevant collective bargaining agreements which prohibits the Memorandum or contemplates the circumstance of emergency service, the Court concludes that no Section 6 notice was required in the instant case.

The crux of emergency service is to prevent the cessation of rail service. To that end, emergency service operators are and should be permitted to set wage and labor agreements during the period they provide service, which is the only approach fully consistent with the purposes of emergency service under Section 11123.

### C. The "Subcontracting" Cases Cited By Appellants Are Inapplicable.

RLEA cites a line of "subcontracting" cases in support of its contention that the Trustee violated Section 6 of the RLA by entering into the Memorandum. The subcontracting cases involve attempts by railroads to circumvent their collective bargaining agreements. For example, in *Burlington Northern R.R. Co. v. United Transp. Union*, 862 F.2d 1266, 1269 (7th Cir.1988), a case relied upon by RLEA and UTU, the Burlington Northern Railroad Company ("Burlington") could not get the United Transportation Union ("UTU") to agree to implement what it termed its "Expeditor Service" on its Northern Line. Thus, Burlington granted trackage rights over its Northern Line to a wholly owned subsidiary, which prior to the trackage agreement had employed only five persons and owned only 1.07 miles of track. *Id.* The Seventh Circuit enjoined the proposed trackage agreement, agreeing with the UTU that Burlington was attempting to avoid its collective bargaining agreement. *Id.* at 1282. The Court stated:

> [W]e conclude that a dispute resulting from a rail trackage rights agreement where a carrier leases trackage rights to a wholly owned, completely dependent subsidiary for the *sole* purpose of avoiding its RLA and contractual responsibilities, is ... subject to resolution under [Section 6 of] the RLA.

*Id.* (emphasis added).

Unlike *Burlington Northern*, this case does not involve a subcontracting of any of D & H's functions to NYS & W, but rather a decision by the ICC. Under these circumstances, RLEA and UTU have not shown that the Trustee was attempting to circumvent D & H's collective bargaining process.

Thus, the Court concludes that the "subcontracting to avoid a collective bargaining agreement" analogy asserted by RLEA and UTU is inappropriate to the facts of this case. As appellee NYS & W points out, unlike in the subcontracting cases cited by RLEA, there was no "voluntary transfer of work from a financially viable employer capable of performing the work." Answering Brief of Appellee, NYS & W at 10–11.

### IV. CONCLUSION

For the reasons discussed, the Court concludes that the May 2, 1989 Order of the Bankruptcy Court should be affirmed.

An appropriate Order will be entered.