In re HECHINGER INVESTMENT
COMPANY OF DELAWARE,
INC., et al., Debtors.

Hechinger Liquidation Trust, as succes-
sor in interest to Hechinger Invest-
ment Company of Delaware, Inc., et
al., Debtors in Possession, Plaintiff,

v.

James Austin Company, Defendant.

Bankruptcy No. 99–02261–PJW.

Adversary No. 01–2432–PBL.

United States Bankruptcy Court,
D. Delaware.

Dec. 13, 2004.

John T. Carroll, III, Cozen O'Connor, Wilmington, DE, Kelly J. Shannon, Karen

Scheibe, ASK Financial, Eagan, MN, for Hechinger Liquidation Trust.

James E. Huggett, Flaster Greenburg, Wilmington, DE, for James Austin Company.

## MEMORANDUM OPINION

PAUL B. LINDSEY, Bankruptcy Judge.

Trial in this adversary proceeding, seeking the avoidance and recovery of certain alleged preferential transfers under §§ 547 and 550 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*,[1] was conducted on September 29, 2004. The Court heard the testimony of witnesses, received other evidence, and heard the arguments of counsel. At the conclusion of the trial, this Court took the matter under advisement. After review and consideration of the evidence, and a review of the law governing the issues in the case, the Court is prepared to announce its decision. This Opinion will constitute the findings of fact and conclusions of law of the Court, as required by Federal Rule of Civil Procedure Rule 52, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure Rule 7052.

## I. BACKGROUND

Hechinger Investment Company of Delaware (hereinafter referred to as "Plaintiff" or "Debtor") filed its Chapter 11 Bankruptcy Petition on June 11, 1999.

Plaintiff filed the Complaint in this adversary proceeding on June 5, 2001 seeking to avoid and recover seven transfers in the aggregate amount of $266,570.48[2] allegedly made by Debtor to James Austin Company, a Pennsylvania corporation (hereinafter referred to as "Defendant"), on or within the 90 days prior to the filing of Debtor's petition in bankruptcy.[3]

With regard to the essential elements of a preference action under § 547, the parties to this action have stipulated: that the transfers were to and for the benefit of the creditor;[4] that the transfers were for or on account of an antecedent debt owed by the Debtor before the transfers were made;[5] and that the transfers were transfers of an interest of the Debtor in property made during the Preference Period.[6] The parties did not stipulate to the remaining essential elements under § 547(b).[7] On September 17, 2004, the Plaintiff made its Motion in Limine to Preclude Defendant from Introducing Any Evidence to Rebut the Debtor's Presumption of Insolvency at Trial (Docket Index

---

1. Hereafter, references to statutory provisions by section number only will be to provisions of the Bankruptcy Code unless the contrary is clearly indicated.

2. In the Complaint, Plaintiff sought to recover $270,754.90 but now concedes that after application of certain credit memoranda, $266,570.48 is the proper amount. As is noted *infra,* Plaintiff has made certain other concessions, further reducing the amount sought to $255,597.20.

3. The period from March 13 to June 11, 1999, hereinafter referred to as the Preference Period.

4. § 547(b)(1)

5. § 547(b)(2)

6. § 547(b)(4)

7. Under § 547(b)(3), the transfer(s) must have been made while the debtor was insolvent. Under § 547(f), debtor's insolvency is presumed on and during the 90 days prior to the petition date. Under § 547(b)(5), the transfer(s) must have enabled the creditor to receive more than it would have received if the case had been one under Chapter 7 of the Bankruptcy Code, the transfer had not been made, and the creditor received payment on its debt pursuant to the provisions of the Code.

44).[8] The Motion in Limine was heard at Plaintiff's request on an expedited basis and the Motion was granted by Order dated September 24, 2004 (D.I. 47). Prior to the trial, the parties submitted their Joint Pretrial Memorandum in accordance with the chambers procedures of this Court, and Plaintiff submitted its trial brief. Trial in this matter was held September 29, 2004.

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to § 157(b)(1) and 157(b)(2), (A), (B), (F), and (O).

## III. DISCUSSION

For its case in chief, Plaintiff sought to prove the remaining elements of § 547(b). Mr. James F. Iampieri, Hechinger's former Vice President of Merchandise Administration, testified that the creditors of the Debtor would not receive a 100% payout on their claims but rather that the ultimate distribution to unsecured creditors is expected to be between six and nine percent. Thus, Plaintiff has established each of the elements of § 547(b). Defendant relies upon § 547(c)(2) for its defense.[9]

The Defendant presented the testimony of its President, Mr. Harry G. Austin. Mr. Austin testified that he had been employed by James Austin Company in several different capacities since October 1979, had been its President since 1999, and that he was very familiar with the company's books and records and the manner in which those records were kept. Mr. Austin further testified that the sales by Defendant to Debtor were almost exclusively bleach and ammonia products. The payment terms between the parties were at all relevant times 2% 30 days, net 31 days, and Mr. Austin testified that ordinarily invoices to Debtor were paid within thirty to sixty days after their issuance, which would be either within invoice terms or up to 30 days late.

Mr. Austin testified that the Defendant generally categorized the payment of invoices in thirty, sixty, ninety, and one hundred twenty days past-due "buckets" or groups. Mr. Austin stated that roughly 10% of Defendant's accounts are paid within invoice terms or within 30 days thereafter; 50% within 60 days; 25% within 90 days and 10% within 120 days or thereafter.

Defendant proffered that its competitors were national firms, Procter & Gamble, Lever, and Clorox, and a small number of regional companies. Mr. Austin testified that he believed that those entities also generally used the same or substantially similar payment terms and that they also categorized receivables in "buckets" in thirty-day increments, although he had no direct knowledge of the practices of the national firms, because there was no published data. A company named Elite, which was in the same industry as Defendant, and was subsequently acquired by Defen-

---

8. Docket References herein will be designated as "D.I. ___."

9. Section 547(c) provides, in material part as follows:

(c) The trustee may not avoid under this section a transfer—

. . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

dant, used this same method of invoicing and categorization.

Mr. Austin testified that Defendant had not done business with Debtor prior to 1998, that the business was largely seasonal and had originated based upon a seasonal promotion of Debtor, and that the relationship was not a "replenishment" business.[10] Defendant's first significant invoice was issued to Debtor in June of 1998, its last shipment to Debtor was made on February 23, 1999, and the last invoice to Debtor was issued April 27, 1999. Thus, the entire business relationship between Debtor and Defendant extended over a period of approximately 10 months.

Mr. Austin testified that orders from Debtor were filled by Defendant by shipments to Debtor's various distribution centers, many shipments being of truckloads, consisting of 770 cases of product, resulting in individual invoices of between $3,000 and $4,000. Debtor, along with all of Defendant's customers, preferred to accumulate a number of invoices and pay them in a single payment. Customers very seldom made a payment covering only one invoice.

Mr. Austin testified that Defendant took no collection action on accounts receivable until they reached the 120–day "bucket," when Defendant attempted to "find out why" payment had not yet been made. Mr. Austin conceded, however, that by that time, it was usually too late, or that the customer was "gone." He testified that no collection action of any kind, no attempt to change billing or collection practices or procedures, and no effort to change credit terms, was ever taken with regard to Debtor.

In contrast, however, Mr. Iampieri testified that Debtor received letters from Defendant disputing the pricing of certain shipments, which Mr. Iampieri characterized as "collection activity" on the part of Defendant. Mr. Austin testified that such were simply routine inquiries, that they were commonplace, and that they were neither "dunning" nor any type of collection activity. Mr. Iampieri did not testify as to when such activity took place, although it appears from other evidence in the record that it may have taken place prior to the preference period.[11]

Debtor contended in its trial brief and through the testimony of Mr. Iampieri, that although Debtor owed an average of $80,000 to Defendant throughout the relationship between the parties, at the end of the preference period that debt had been reduced to $42,507.26, the amount for which Defendant filed a proof of claim in Debtor's bankruptcy. Debtor contends that this, and the fact that Defendant ceased doing business with Debtor during the preference period, is evidence that Defendant "cut its credit exposure" during the preference period. In response, Mr. Austin reiterated his assertion that the business relationship between the parties was never a "replenishment" relationship, and that Defendant shipped product to Debtor only as and when it received specific orders therefor. He further testified that the reason for the reduced amount outstanding at the petition date and for the cessation of business between the parties was that Debtor simply ceased ordering product from Defendant. According to Mr. Austin, the business relationship between Debtor and Defendant had changed.

10. On cross-examination, Mr. Austin conceded that based upon the number and timing of invoices issued to Debtor over the life of the business relationship, the relationship appeared to be more "ongoing" than seasonal in nature.

11. *See* discussion of Debtor's check number 20198757, *infra*.

Debtor had wanted to establish a private label brand of bleach, but name changes and differences within its organization made that impractical. Early in 1999, Defendant was aware of Debtor's then current marketing plan and that Debtor had already ordered and received the product it required for its 1999 spring promotion. It was therefore not necessary for Defendant to inquire of Debtor as to why it had stopped ordering product at that time.

Plaintiff introduced several exhibits at the trial in support of its positions. Its Exhibit 1 is a list and copies of the seven checks issued by Debtor to Defendant during the preference period, ranging from $3,546.96 to $65,700.86 and totaling $266,570.48.

Exhibit 2 is a compilation of all invoices paid by the preference period payments, setting out each invoice's date, amount and due date, the number, amount and clearance date of each of the seven checks, and the number of days early or late as to each invoice.[12] The compilation shows the payments to range between 10 and 66 days late, and to be both an average, and a weighted average, of 39 days late.

Exhibit 3 is a copy of Plaintiff's First Set of Interrogatories, Requests for Production, and Requests for Admission, and the responses thereto, authenticated by Mr. Austin.

Exhibit 4 is Plaintiff's "Analysis of Ordinary Course of Business—Summary." In this document, Plaintiff deducts certain credit memoranda totaling $4,184.42 from the $270,754.90 total of the preference period checks, reducing the amount sought to $266,570.48. It then further reduces the amount sought by $3,623.14 in "new value" provided to Debtor by Defendant after the transfers to it were made,[13] and by $7,350.14 in "Allowed OCB." Plaintiff refers to the latter amount in its trial brief as being the amount of payments which were made within 20 days of the invoice due date, which "may constitute payments made in the ordinary course of business between the parties" (Plaintiff's Trial Brief, at 4) and which it will therefore not seek to recover. The amount sought by Plaintiff after these reductions is $255,597.20.

Exhibit 4 contains side-by-side presentations of the number, percentage and amount of invoices paid early or past due for various periods during the preference period and for the one year prior to the preference period.[14] As is shown in Exhibit 2, discussed *supra*, the payments during the preference period were made an average and a weighted average, of 39 days late. In the pre-preference period, however, the payments were made an average of 29 days late, but a weighted average of only 18 days late. The difference between the number of days late in the two periods is shown to be 34% as to the average, but 117% as to the weighted average.

Plaintiff's Exhibit 5 is the pre-petition counterpart of Exhibit 2, a compilation of all payments made and invoices paid by

12. This number was the number of days before or after 31 days from date of invoice to the clearance date of the check, minus one day.

13. *See* § 547(c)(4). This amount was set out, and apparently agreed to, in the parties' Joint Pretrial Memorandum (D.I. 40, 42).

14. The periods covered by the presentations are: Early; 0–15 (days past due); 16–20; 21–25; 26–30; 31–36; 37–40; 41–46; 46–60; and Over 60. It is noted that the relationship between the parties did not extend for a full year prior to the preference period. The first check paid by Debtor to Defendant during the pre-preference period cleared on July 29, 1998.

Debtor to Defendant during the year prior to the preference period.

Mr. Iampieri testified that weighted average is important because it is common for there to be shortages, damaged goods and the like in connection with shipments, and that invoices issued pursuant to such shipments will be disputed, resulting in such invoices being paid later than would otherwise be the case. Similarly, there are cost and price discrepancies which are protested, and which must be discussed, negotiated and adjusted. He indicated that using weighted average takes into account the adjustments required by such circumstances, and "normalizes the payment history." Mr. Iampieri made specific reference to one check, number 20198757, which cleared on October 14, 1998. He indicated that this check was a late payment due to certain "cost discrepancy adjustments." A review of Exhibits 4 and 5 reveals that the particular check referred to by Mr. Iampieri, was in the amount of $43,357.87; that it paid a total of 160 invoices; that it paid $40,014.31 (9.67%) of the $413,715.08 paid by Debtor to Defendant during the pre-preference period; that it paid all 159 of the invoices shown in Exhibit 4 as having been paid more than 46 days past due, and 34% of the 465 invoices paid during the pre-preference period.

This Court appreciates that devices such as weighted averages may be important in the business world for statistical purposes such as "normalizing" payment histories. However, given the fact, as Mr. Iampieri testified, that problems such as those described by him are "common," this Court questions whether it is appropriate to employ such "normalizing" devices in connection with a determination of whether a particular payment or series of payments comes within the concepts of "ordinary course of business" or "ordinary business terms," as those terms are employed in the Bankruptcy Code.

Here, 29 days late is the average for the pre-preference period, compared with 39 days for the preference period. Using the weighted average of 18 days late during the pre-preference period, Plaintiff concedes that payments made 20 or less days late may be assumed to be in the ordinary course of business, and has reduced the amount sought to be avoided and recovered by it accordingly. If the weighted average computation contained within Plaintiff's Exhibit 4 is not used, the simple average of 29 days late would presumably compel Plaintiff to concede that payments made 30 or less days late would be in the ordinary course of business. Based upon the Plaintiff's Exhibit 4, such a concession would bring an additional $51,096.02, the total of the 14 invoices which were paid between 26 and 30 days late, under the ordinary course of business "umbrella."

In order to come within the protection of § 547(c)(2), Defendant has the burden of proving by a preponderance of the evidence the nonavoidability of the transfers, § 547(g). The three subparts of § 547(c)(2) must be read in the conjunctive, and each must be proven separately. *J.P. Fyfe, Inc., of Florida v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir.1989). In this case, Plaintiff concedes that the first prong of § 547(c)(2) is established, and therefore, the debt in question was incurred by the Debtor in the ordinary course of the business or financial affairs of the Debtor and the Defendant. § 547(c)(2)(A).

Plaintiff contends, however, that Defendant has not satisfied either of the remaining prongs of § 547(c)(2): that the payments were made in the ordinary course of business or financial affairs of the Debtor and the Defendant, § 547(c)(2)(B), and

that the payments were made according to ordinary business terms, § 547(c)(2)(C).

Noting that other courts have "lamented" the fact that Congress has failed to define its understanding of the term "ordinary," the *J.P. Fyfe* court, which was called upon to address only § 547(c)(2)(B), made the following statement:

> The scanty legislative history of this section reveals only that "the purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted* in 1978 U.S.Code Cong. & Admin.News 5787, 5874. Congress has apparently left to the courts the task of defining "normal financing relations."

*J.P. Fyfe*, 891 F.2d at 70.

In *J.P. Fyfe,* the creditor had agreed to freeze $500,000 of prior indebtedness of debtor, to continue to do business with debtor, but not on the "open account" basis as previously. The new arrangement was to include, *inter alia*, selective filing of notices of non-payment by the creditor in order to ultimately obtain liens on construction projects in which debtor was involved. This new arrangement was clearly a significant variation from the parties' previous course of doing business, and together with the creditor's detailed knowledge of the debtor's deteriorating financial condition, enabled the creditor to "in essence, obtain a head start in securing its claims." *Id.,* 891 F.2d at 71. The court had little difficulty affirming the determination of the Bankruptcy and District Courts that the creditor had not met its burden of proof under § 547(c)(2)(B), and that the transfer in question was avoidable as a preference.

The determination of whether a creditor has met its burden under § 547(c)(2)(B) is a subjective test involving the consistency of transactions between the debtor and creditor before and during the preference period. *SEC v. First Jersey Sec. (In re First Jersey Sec.),* 180 F.3d 504 (3d Cir.1999). *See,* 5 Collier on Bankruptcy ¶ 547.04[2][a][ii][B] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) The courts consider various factors in determining such consistency:

> (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.

*In re Allegheny Health, Education and Research Foundation,* 292 B.R. 68 (Bankr. W.D.Pa.2003).

As has been noted herein, the entire business relationship between Debtor and Defendant occupied a period of approximately 10 months. Plaintiff points to the fact that more than $234,000 was paid in only four (4) checks during less than a month during the preference period, and asserts that this is an unusually large amount. It is noted that early in the relationship between the parties, Debtor paid a total of 100 invoices in a single $78,000 check. (Plaintiff's Exhibit 5) It is also noted that prior to December 1, 1998, only nine (9) of the 421 invoices issued by Defendant to Debtor were for more than $1,000, most being for substantially less than that amount. After December 1,

1998, for the balance of the pre-preference period and during the preference period, only 12 of the 128 invoices issued was for less than $3,000.[15] In these circumstances, it is not at all unusual for the payments to be larger during the later periods.

At no time did Defendant suggest or require payment other than by check, and all payments made by Debtor to Defendant were made in that manner.

The evidence shows that during the business relationship between the parties, there was no change whatsoever in the credit terms on which the parties conducted business; there were no letters, telephone calls, or any attempts whatsoever on the part of Defendant to apply pressure or to "dun" Debtor to encourage more prompt payment; there were no attempts by Defendant to change credit, delivery, or other terms or conditions of the relationship; there were no threats or intimidation by Defendant, direct or indirect; and there was no indication whatsoever of any intention on the part of Defendant to institute legal action to collect amounts owed to it.[16] Defendant received and filled orders for product, issued invoices and received payment therefor, all in precisely the same manner as had been the case throughout the admittedly short business relationship of the parties. In short, the evidence clearly supports a determination that Defendant did not at any time engage in any unusual behavior to improve its position as compared to other creditors of the Debtor.

The only support for Plaintiff's position with regard to § 547(c)(2)(B), therefore, appears to be the fact that invoices were paid later during the preference period than during the pre-preference period. This Court does not believe that the difference in this case is outside the normal range of activity between these parties during their business relationship. Plaintiff's Exhibit 4 shows that 20% of Debtor's pre-preference period payments were more than 60 days late, as compared to only 8% of the payments during the preference period. While the late payments in the pre-preference period apparently were due to at least in major part to pricing discrepancies, such problems were not unusual, and there is no assurance that at least a portion of the payments during the preference period may have been occasioned by such problems. In any event, there is no sudden or substantial departure from normal and ordinary billing and payment procedures, and no payment during the preference period was more than 66 days late. According to Mr. Austin's testimony, therefore, no payment by Debtor to Defendant was as late as the payments of some 35% of Defendant's other customers. Certainly, the payments were not so late as to even suggest any collection action or even an inquiry on the part of Defendant.

Based upon the foregoing, this Court finds that Defendant has met its burden of establishing by a preponderance of the evidence that the payments in question here were made in the ordinary course of the business or financial affairs of Debtor and the Defendant, and that the requirements of § 547(c)(2)(B) are satisfied.

■ The determination as to whether Defendant has met its burden under

---

**15.** Each of the larger invoices presumably represented truckload shipments, as testified to by Mr. Austin.

**16.** The only indication of any contact whatsoever between the parties apart from orders, shipments, invoices and payments was the testimony of Mr. Iampieri concerning letters from Defendant to Debtor questioning cost and pricing as to certain invoices, which presumably took place prior to the preference period. *See* discussion, *supra*.

§ 547(d)(2)(C) is objective: Were the payments made according to ordinary business terms?

■ "'[O]rdinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *Fiber Lite Corp. v. Molded Acoustical Prod. (In re Molded Acoustical Prod.)*, 18 F.3d 217, 224 (3d Cir.1994), (quoting *In re Tolona Pizza Products Corporation*, 3 F.3d 1029, 1033) (emphasis in original).

■ As has been already discussed, Mr. Austin testified that Defendant was engaged in the bleach industry, and that its sales to Debtor were almost exclusively of bleach and ammonia products. He testified that he had been employed by Defendant in various capacities since October 1979, had been its President since 1999, and was very familiar with its books, records and procedures. He testified to the credit terms and procedures employed by Defendant, and that to his knowledge and belief, such terms and procedures are representative of those employed throughout the bleach industry. Mr. Austin also testified that the bleach industry was a small one, in that Defendant's only competitors are three international industrial giants and a small number of regional companies, including one named Elite, which employed the same credit terms and procedures as those employed by Defendant and which Defendant subsequently acquired for $5,200,000.

Mr. Austin's testimony was the sole evidence presented with regard to what constituted "ordinary business terms" in Defendant's industry, the bleach industry. In *In re Cherrydale Farms, Inc.*, 2001 Bankr.LEXIS 156, 2001 WL 1820323 (Bankr.D.Del.2001), Judge Walsh of this Court deemed testimony of the Chief Financial Officer of the debtor, with many years of experience with the debtor and in its industry sufficient to establish evidence of an industry standard, noting that: "I cannot think of a better witness." *Id.*, 2001 WL 1820323, at *5. *See also Troisio v. E.B. Eddy Forest Products, Inc. (In re Global Tissue, L.L.C.)* 302 B.R. 808 (D.Del. 2003), *affirmed*, 106 Fed.Appx. 99, 2004 U.S.App. LEXIS 14003, 2004 WL 1510091. ("[We] believe that the decision in Cherrydale supports the notion that testimony from employees of the parties involved in a preference payment dispute may be used to establish an industry standard, as long as the court determines that the employees are credible and have significant and relevant industry experience. This position is consistent with the holding in Molded Acoustical.")

■ This Court found Mr. Austin to be credible and believes his experience in the bleach industry to be both significant and relevant. It is important to note that Plaintiff offered neither evidence nor argument to contradict his testimony. The analysis of § 547(c)(2)(C) in *Tolona Pizza*, adopted by *Molded Acoustical*, affords meaning to that provision, but does not render its satisfaction so exacting as to require a proponent to depend upon information which may be difficult if not impossible to obtain from competitors within its industry. *Molded Acoustical*, 18 F.3d at 224. In the absence of any evidence or argument controverting Mr. Austin's testimony, and finding the same to be cogent, believable and entirely reasonable in the circumstances, this Court finds and concludes that Defendant has met its burden of proof under § 547(c)(2)(C), to establish by a preponderance of the evidence that

the payments in question here were made according to ordinary business terms.

## IV. CONCLUSION

In *Molded Acoustical*, the court describes the purposes and intents of § 547, and the issues presented by cases such as those before this Court, as follows:

> On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy. See H.R. REP. No. 595, 95th Cong., 1st Sess. 177–78 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6138; *Union Bank v. Wolas*, [502] U.S. [151], 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991).

*Molded Acoustical*, 18 F.3d at 219–220. *See also Global Tissue*, 106 Fed.Appx. at 102.

If these aims are to be met, in cases such as these, the approach of Judge Posner in *Tolona Pizza*, and adopted by *Molded Acoustical*, must be applied by the courts with the flexibility which it demands. Otherwise, the pendulum will be allowed to swing to one or the other side of the issue, and the Congressional intent will be thwarted.

Plaintiff has conceded, and the Court finds, that the transfers in question here, were in payment of debts incurred by Defendant in the ordinary course of business or financial affairs of Debtor and Defendant.

This Court has found that Defendant has satisfied the burden of proof placed upon it by § 547(g), that it has proven the nonavoidability of the transfers by the preponderance of the evidence under both § 547(c)(2)(B) and (C), and therefore, the transfers were made in the ordinary course of business or financial affairs of Debtor and Defendant, and that the transfers were made according to ordinary business terms.

Defendant is therefore entitled to judgment in its favor and against Plaintiff, the transfers in question herein are held not avoidable pursuant to § 547 and therefore not recoverable by Plaintiff under § 550, and Plaintiff shall take nothing by reason of its complaint herein.

## *ORDER GRANTING JUDGMENT IN FAVOR OF DEFENDANT*

For the reasons set forth in the accompanying Memorandum Opinion of even date herewith, **IT IS HEREBY ORDERED** that Judgment is entered for James Austin Company and against Hechinger Liquidation Trust, for the transfers in the total amount of $255,597.20. Hechinger Liquidation Trust shall take nothing by reason of its complaint.