**In re CONTINENTAL ENERGY ASSOCIATES LIMITED PARTNERSHIP, Debtor.**

**Continental Energy Associates Limited Partnership, Plaintiff,**

**v.**

**Al Robert Olhanoski d/b/a Equipment Services, Defendant.**

**Bankruptcy No. 5–94–01486.**
**Adversary No. 5–96–00402.**

United States Bankruptcy Court,
M.D. Pennsylvania,
Wilkes–Barre Division.

Oct. 19, 1998.

Lawrence Handelsman, New York City, for Debtor/Plaintiff.

Charles A. Shea, III, Kingston, PA, Co-Counsel for Debtor/Plaintiff.

Michael R. Lastowski, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Creditors' Committee.

Michael Beltrami, Hazleton, PA, for Defendant.

### OPINION AND ORDER [1]

JOHN J. THOMAS, Bankruptcy Judge.

The Debtor–In–Possession, Continental Energy Associates Limited Partnership, has filed a Complaint to set aside a preferential payment by the Debtor to Al Robert Olhanoski d/b/a Equipment Services (hereinafter "Defendant") under the terms of 11 U.S.C. § 547(b). While the parties stipulated the transfer was preferential under § 547(b), the Defendant has responded the transfer is unavoidable because it falls within the safe harbor created by Congress found in 11 U.S.C. § 547(c)(2). Based upon the following findings of fact and conclusions of law, the Court concludes the Defendant has not met its burden of proving the nonavoidability of the transfer under subsection (c) of 547. See 11 U.S.C. § 547(g).

The facts were elicited at a day of trial consisting of the oral testimony of several witnesses together with the stipulated testimony and supplemental stipulated testimony of Mr. George Roskos, project manager of Continental Energy Associates, LP (hereinafter "CEA").

The facts are as follows. The Debtor operated a co-generation plant and a coal processing plant which, in its daily operation, required the use of heavy equipment including loaders, dozers, trucks, dragline shovels, and other equipment. From time to time, to service this heavy equipment, the Debtor engaged the services of Highway Equipment and Supply Company and Caterpillar Equipment. In or about October of 1991, Mr. Roskos hired the Defendant to perform the repair services for the Debtor. The Defendant testified he performed approximately 99% of all the repair work on the heavy equipment for the Debtor. As reflected in Plaintiff's Exhibit No. 4, the parties had a prepetition business relationship from 1991 through November of 1994. This business relationship continued postpetition. Mr. Olhanoski testified that he utilized the same billing procedure both prepetition and postpetition. The agreement between the parties concerning billing was that the Defendant, by the tenth day of any given month, would bill the Debtor for repair work performed during the prior month. Other trade creditors followed the same billing procedure. Attached is a schedule substantially reflecting the contents of Plaintiff's Exhibit 4 which provides the date services were rendered, the date payment was requested, the date the invoice was paid, and the amount paid. It is the final payment made November 10, 1994, for invoices dated September 13, 1994, October 10, 1994, and October 28, 1998, which is the subject of this litigation. The total amount in controversy is Twenty–Eight Thousand Four Hundred Ninety Dollars ($28,490.00).

Central to this case is the stipulated testimony of Mr. George Roskos. Included among his many duties for CEA was the payment of account receivables. He was responsible for all requisitions and for reviewing all payments. This task was his, both prior to and subsequent to the filing of the bankruptcy. Other trade creditors followed the same billing procedures as the Defendant. To the extent the trade creditors would submit their bills by the 10th day of any particular month, they would be included in a requisition process which was as follows. The requisition was forwarded to the Debtor's main office in Massachusetts where it would be forwarded to Swiss Bank in New York, the Debtor's principal secured creditor. When Swiss Bank reviewed and approved the requisition, it would so notify Mellon Bank in Pittsburgh, Pennsylvania, and checks would be sent to Mr. Roskos drawn on the Debtor's account. The Debtor would then mail the check to the vendor or the vendor would pick up the check. The other two businesses engaged to perform repair work typically billed and were paid in a like manner. Several times during the years preceding the bankruptcy, the Debtor would fall behind in monthly payments to the Defendant and other trade creditors. When that happened, payments were made for more than one month of work. A review of the attached schedule indicates there were several occasions the Defendant was paid with one check representing payment for more than one invoice. For instance, see payments on 12–22–92, 5–20–93, 11–22–93, and 11–10–94.

1. Prepared with the assistance of Richard P. Rogers, Law Clerk.

Mr. Roskos' stipulated testimony indicates that approximately one week prior to the bankruptcy filing date of November 14, 1994, there was a meeting at his office in which he became aware that the Debtor would be filing a bankruptcy petition. He was instructed to make future payments on behalf of the Debtor by cashier's check. Cashier's checks were used to make the last payroll prior to the bankruptcy. These payments did not require a requisition addressed to Swiss Bank. Instead, they were drawn on the Debtor's funds at PNC Bank. Some vendors, however, were not paid at all.

Having stipulated that the disputed payment was a preferential transfer as defined by of § 547(b), the burden shifted to the Defendant to prove the payment fell within the safe harbor provided in § 547(c)(2). That section reads as follows:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

Neither party argues that § 547(c)(2)(A) is at issue in this case. Both parties agree the Debtor incurred the underlying debt in the ordinary course of the business between the Debtor and the Defendant. It is both the second and third element found in § 547(c)(2)(B) and (C) that are at issue.

The Third Circuit in the case of *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corporation*, 891 F.2d 66 (3rd Cir.1989) addressed whether a disputed payment qualifies as a payment made in the ordinary course of business under 11 U.S.C. § 547(c)(2)(B). The Third Circuit analyzed the requirements of § 547(c)(2)(C) in the case of *Fiber Lite Corporation v. Molded Acoustical Products, Inc.*, 18 F.3d 217 (3rd Cir.1994). Because the Court finds the Defendant has not car-

ried its burden of proof as required by § 547(g) proving that the payment in question was made in the ordinary course of business or financial affairs of the Debtor and the Defendant under § 547(c)(2)(B), the Court need not determine whether the payment was made according to ordinary business terms as set forth in § 547(c)(2)(C).

For a payment to qualify under the exception of subsection (c)(2) of section 547 and to render the transfer nonavoidable, a creditor must prove by a preponderance of the evidence the three statutory conjunctive elements. First, the creditor must show that the debtor incurred the underlying debt in the ordinary course of business of the debtor and the transferee. Both parties here agree that the underlying debt meets this requirement. Second, the creditor must show that the debtor made the transfer in the ordinary course of business or financial affairs of the debtor and the transferee. Finally, the creditor must show, that the payment was made according to the ordinary business terms. *WJM, Inc. v. Massachusetts Dep't of Pub. Welfare*, 840 F.2d 996, 1010–11 (1st Cir.1988).

*J.P. Fyfe, Inc.*, 891 F.2d at 69.

The *Fyfe* Court, contemplating what Congress may have meant by the term "ordinary," observed that the term was not defined. It then pointed to the brief legislative history on this section which provides the following:

[t]he purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy. S.Rep. No. 989, 95th Cong., 1st Sess. 88, reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5874. Congress has apparently left to the courts the task of defining "normal financing relations."

*J.P. Fyfe, Inc.*, 891 F.2d at 70.

In the *Fyfe* case, when addressing what was "ordinary course of business" under § 547(c)(2)(B), the Circuit Court wrote that the lower court had to analyze only the con-

text of the business relationship between those parties involved in that case.

The *Fyfe* Court indicates that a "variation from the parties' normal course of doing business is significant." *Id.* at 70. This Court will follow the direction of the Third Circuit in the *Fyfe* case and will analyze the history and course of the business relationship of the parties, in particular their payment history in considering the arguments made as to whether those payments fall within the safe harbor of § 547(c)(2).

The position of the parties can be summarized as follows.

The Plaintiff argues that the November 10th payment is significant for the following reasons. First, prior to November 10th, the Debtor did not pay its trade creditors or the Defendant by cashier's check. Second, the payment at issue represented the first instance where the Debtor paid three invoices in one payment. Third, the Defendant billed for services during the same month when the services were rendered. Fourth, the payment of the invoices for September and October were paid within thirty-one and thirteen days of the demand for payment, respectively. And fifth, no prior invoices had been paid within such a short time span.

The Defendant responds that, on several occasions, the Defendant was paid by one check for multiple invoices. Batch payments were within the ordinary course of business established by the parties. Furthermore, the fact that the last payment was made by a cashier's check is of no importance because that alone does not take the payment out of the ordinary course of business, citing *The Matter of Sims Office Supply, Inc.*, 94 B.R. 744 (Bankr.M.D.Fla.1988). In this regard, that Mr. Roskos was instructed to make final payments by cashier's check in November of 1994, minimizes the fact the Defendant had not previously received payment by cashier's check. Because all payments made in the week before bankruptcy were made by cashier's check, that was the usual practice of payment at that time. The record shows the Defendant never stopped doing work for the Debtor and never pressured the Debtor or threatened to stop work for the Debtor if he didn't receive payment. Furthermore, the

Defendant casually argues he provided contemporaneous exchange of services constituting new value in exchange for the payments and under § 547(c)(4) payment cannot be avoided by the debtor-in-possession.

For the safe harbor provisions of § 547(c)(2) to apply, all three elements of the subsection need to be established. *J.P. Fyfe, Inc.*, 891 F.2d at 69. While both parties spent substantial time arguing whether the payment was made according to ordinary business terms under § 547(c)(2)(C), the Court's analysis will focus only on § 547(c)(2)(B). First, the Court finds nothing unusual about the last payment covering several invoices. As mentioned, several times in the three to four year history of the business relationship between these parties, multiple invoices were paid with one check. The Court discounts that portion of the argument in its analysis. The September invoice was paid almost two months after it was submitted. The October 10th invoice was paid 31 days after it was submitted, which falls below the average payment time between submission of invoice and payment, but which was not significant enough for this Court to find that it fell outside the ordinary business terms established by the parties.

█ The circumstances surrounding the final invoice for work submitted on October 28, 1994, does raise some concern. That invoice was paid by cashier's check within thirteen days of the demand for payment which was substantially quicker than the average time between submission of invoice and payment. The Plaintiff points out it was the only time in the four year business relationship between the parties that an invoice was submitted during the same month in which the work was performed. The invoice was submitted right before the filing of the bankruptcy.

The Court agrees payment by cashier's check alone does not take the payment out of the specter of being in the ordinary course of business terms between the parties. *See In re Craig Oil Company*, 785 F.2d 1563 (11th Cir.1986). The *Sims Office Supply* Court, citing *Craig Oil*, looked at other factors listed as follows:

Surrounding factors which would indicate the payment by cashier's check is outside the ordinary course of business are where (1) the debtor had not previously paid by cashier's check; (2) a significant number of payments were overdue; (3) payments were made after the Debtor stopped doing business with the creditor and after the Debtor ceased operations; (4) the payment was induced by the creditor's request for assurance of payments; and, (5) another creditor was attempting to push the debtor into bankruptcy. *Craig Oil, supra*, at 1568.

*The Matter of Sims Office Supply, Inc.*, 94 B.R. 744, 749 (Bankr.M.D.Fla.1988).

In applying those factors to this case, we find the following. The facts reflect the Debtor had not previously paid the Defendant by cashier's check. At the time payment was made by cashier's check just prior to bankruptcy, there were overdue payments of two months. While the facts do not reflect the payment was induced by the Defendant's request for assurance of payments, the payment did fall out of the ordinary course in that an invoice was submitted for a month in which the work was performed. This pattern had not been established in four years prior to the invoice being submitted. Of significance to this Court is that not all creditors, including trade creditors, were paid during the final week prior to bankruptcy. Moreover, Mr. Roskos making the last payments by cashier's check altered the mode of payment established over years between the parties. That alteration, most significantly, came on the eve of the Debtor going into bankruptcy. The Court is of the opinion that this is exactly the type of preferential treatment of creditors prior to bankruptcy which § 547(b) seeks to address. This Court is convinced the final payment represented by the cashier's check on November 10, 1994 does not fall within the safe harbor provided by 11 U.S.C. § 547(c)(2) and, therefore, is avoidable by the Plaintiff.

■ Finally, the Defendant also argues that he provided contemporaneous new value under § 547(c)(4) and this payment is unavoidable by the Plaintiff. Addressing the requirements of § 547(c)(4) the Third Circuit in the case of *New York City Shoes, Inc. v. Bentley International, Inc.*, 880 F.2d 679 (3rd Cir.1989) wrote:

First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, after receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition. See *In re Almarc Manufacturing, Inc.*, 62 B.R. 684, 686 (Bankr.N.D.Ill. 1986). If a creditor satisfies these elements, it is entitled to set off the amount of the "new value" which remains unpaid on the date of the petition against the amount which the creditor is required to return to the trustee on account of the preferential transfer it received.

*Id.*

The parties stipulated to the first requirement that the transfer was a voidable preference under § 547(b). The Defendant claims he advanced new value to the Debtor on an unsecured basis in providing services after the last payment received but before the bankruptcy was filed thus meeting the second prong of § 547(c)(4). The Court need not find the second prong was met, because the third factor was not established by any of the evidence at the time of trial. All services were rendered through the submission of the invoice of October 28, 1994. There is absolutely no evidence of record as to what kind of services, if any, were supplied to the Debtor by the Defendant within the subsequent two weeks prior to filing the bankruptcy. Presumably, the Defendant never stopped working for the Debtor, however, the record is void of any reference as to the value of any of those services. The Court finds the Defendant did not advance new value to the Debtor under § 547(c)(4).

An appropriate Order will follow.

ATTACHMENT

| DATE PAID | AMOUNT PAID | DATE SERVICES RENDERED | DATE PAYMENT REQUESTED (INVOICE DATE) | TIME BETWEEN REQUEST AND PAYMENT |
|---|---|---|---|---|
| 12/19/91 | $5,940.00 | 10/91 | 11/1/91 | 48 |
| 1/15/92 | $5,765.00 | 11/91 | 12/3/91 | 43 |
| 2/12/92 | $9,270.00 | 12/91 | 1/4/92 | 39 |
| 3/13/92 | $5,535.00 | 1/92 | 2/5/92 | 37 |
| 4/21/92 | $5,190.00 | 2/92 | 3/4/92 | 38 |
| 5/18/92 | $7,250.00 | 3/92 | 4/3/92 | 45 |
| 6/22/92 | $8,345.00 | 4/92 | 5/1/92 | 52 |
| 7/29/92 | $10,140.00 | 5/92 | 6/5/92 | 54 |
| 9/1/92 | $8,775.00 | 6/92 | 7/1/92 | 62 |
| 9/24/92 | $6,740.00 | 7/92 | 8/6/92 | 49 |
| 10/19/92 | $6,835.00 | 8/92 | 9/1/92 | 48 |
| 12/22/92 | $7,445.00 | 9/92 | 10/13/92 | 70 |
| 12/22/92 | $8,325.00 | 10/92 | 11/6/92 | 46 |
| 1/20/93 | $5,775.00 | 11/92 | 12/14/92 | 37 |
| 2/16/93 | $6,360.00 | 12/92 | 1/11/93 | 36 |
| 4/16/93 | $5,915.00 | 1/93 | 2/10/93 | 34 |
| 5/20/93 | $7,405.00 | 2/93 | 3/10/93 | 71 |
| 5/20/93 | $8,805.00 | 3/93 | 4/13/93 | 37 |
| 6/18/93 | $9,320.00 | 4/93 | 5/7/93 | 42 |
| 8/3/93 | $9,660.00 | 5/93 | 6/11/93 | 53 |
| 8/24/93 | $10,260.00 | 6/93 | 7/8/93 | 47 |
| 9/20/93 | $7,820.00 | 7/93 | 8/11/93 | 40 |
| 11/22/93 | $7,720.00 | 8/93 | 9/10/93 | 73 |
| 11/22/93 | $8,910.00 | 9/93 | 10/11/93 | 42 |
| 12/21/93 | $12,670.00 | 10/93 | 11/8/93 | 43 |
| 1/19/94 | $12,985.00 | 11/93 | 12/6/93 | 44 |
| 2/22/94 | $9,555.00 | 12/93 | 1/7/94 | 46 |
| 3/24/94 | $6,480.00 | 1/94 | 2/8/94 | 44 |
| 4/25/94 | $8,820.00 | 2/94 | 3/9/94 | 47 |
| 5/20/94 | $9,580.00 | 3/94 | 4/8/94 | 42 |
| 6/20/94 | $8,070.00 | 4/94 | 5/10/94 | 41 |
| 7/20/94 | $9,560.00 | 5/94 | 6/13/94 | 37 |
| 8/19/94 | $10,080.00 | 6/94 | 7/11/94 | 39 |
| 9/20/94 | $10,240.00 | 7/94 | 8/4/94 | 47 |
| 11/10/94 * | $8,355.00 | 8/94 | 9/13/94 | 58 |
| 11/10/94 * | $10,465.00 | 9/94 | 10/10/94 | 31 |
| 11/10/94 * | $9,670.00 | 10/94 | 10/28/94 | 13 |

* These payments were made by one cashier's check.