In re LOGAN SQUARE EAST, Debtor.

Logan Square East, Plaintiff,

v.

Peco Energy Co., Defendant.

Bankruptcy No. 98–10504–SR.
Adversary No. 00–22.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 9, 2000.

Barry D. Kleban, Maryjo Wlazlo, Leon R. Barson, Adelman, Lavine Gold and Levin, Philadelphia, PA, for debtor.

Gregory Golazeski, Susan Foehl, Philadelphia, PA.

Joseph P. McMahon, Asst. U.S. Trustee, Office of U.S. Trustee, Philadelphia, PA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

The Court has before it motions for summary judgment filed by both Plaintiff Logan Square East (the "Debtor") and Defendant PECO Energy Company ("PECO") in the instant adversary proceeding brought by the Debtor to avoid and recover certain payments it made to PECO as "preferences" under 11 U.S.C. § 547.[1] Though the parties have stipulated to the existence of certain facts which satisfy the general requirements for avoidance liability under 11 U.S.C. § 547(b), left open is the question of whether the payments fit within an exception for transfers made in the "ordinary course of business." 11 U.S.C. § 547(c)(2). A hearing on the motions was held on September 14, 2000. For the reasons stated more fully below, PECO's motion will be denied and the Debtor's motion shall be granted.

## BACKGROUND

The Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code"), 11 U.S.C. §§ 101–1330, on January 13, 1998, and commenced the instant adversary on January 1, 2000. By means of this action the Debtor seeks to avoid payments in the amount of $53,286.94 and $61,737.54 which it made to PECO shortly before it filed its Chapter 11 petition as "preferences" under Code § 547.

Subject to certain exceptions, discussed, *infra*, Code § 547(b) allows the trustee, or in this case the debtor-in-possession, Code § 1107(a), to avoid transfers of an interest of the debtor in property that are:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Though the burden of proving avoidability under this section rests with the Debtor, *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991), *cert. denied sub nom., Committee of Unsecured Creditors v. Mellon Bank, N.A.*, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); Code § 547(g), the parties have stipulated that the foregoing criteria are met in this case,

---

1. The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. § 1334, § 157(a), § 157(b)(1) and (b)(2)(A), (F) and (O).

and thus subject only to the applicability of the "safe harbor" provisions found in § 547(c), the payments at issue are avoidable preferences under § 547(b).

■ Both parties have moved for summary judgment joining issue on the question of whether the safe harbor provision excepting from avoidance payments made in the "ordinary course of business," 11 U.S.C. § 547(c)(2), applies here. This section provides that:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

*Id.* The foregoing criteria are stated in the conjunctive, therefore all three must be shown in order for the exception to apply. *See J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.,* 891 F.2d 66, 69 (3d Cir. 1989). PECO, as the party seeking to except the payments from avoidance, bears the burden of proof as to the required elements by a preponderance of the evidence. *See Id.; accord, In re Honey Creek Entertainment, Inc.,* 246 B.R. 671, 689 (Bankr.E.D.Okla.2000); Code § 547(g).

The first of the required elements is satisfied here as the parties have stipulated that the transfers were made in payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and PECO. Code § 547(c)(2)(A). Remaining to be decided, therefore, are: a) whether the transfers were made in the ordinary course of business or financial affairs of the Debtor and PECO (*i.e.* "ordinary between the parties"), Code § 547(c)(2)(B); and b) whether the transfers were made according to ordinary business terms (*i.e.,* "ordinary within the industry"). Code § 547(c)(2)(C). For purposes of making this determination, the parties have further stipulated that:

— PECO provided electric utility service to Debtor from May, 1983, to June, 1999.

— Debtor made five payments to PECO during the ninety (90) days preceding the filing of the bankruptcy petition, two of which are the subject of this adversary proceeding.

— The first of the subject transfers was made by check no. 019640, dated December 22, 1997 in the amount of $53,286.94. The check was received by PECO on December 23, 1997.

— The second transfer was made by cashier's check no. 4399505, dated January 12, 1998, in the amount of $61,737.54. PECO received the check on January 13, 1998.

— Both checks were mailed to PECO as were all other payments made by the Debtor to PECO from 1994 to January 1998.

Attached to the parties' stipulation, and incorporated therein, are the following documents obtained from PECO company records: a) correspondence relating to PECO's request for a $90,000 security deposit in 1983 when electric service was first established, and other company records evidencing the return of such deposit to the Debtor in 1987, Exhibits A, A–1, A–2 and A–3; b) billing and payment history records relating to the Debtor's account for the following time periods: i) December 1990 to August 1991; ii) December 1992; iii) February 1993 to 1994; and iii) November 1994 to September 1998, Exhibit B; c) account remarks (essentially notes made by PECO employees concerning contacts with the Debtor, and PECO actions pertaining to the account) from May 26, 1992 to February 4, 1998, and a sample PECO payment reminder letter as referenced in the account remarks, Exhibits C

and D; d) correspondence between the Debtor and PECO from April 1991 to January 1998, Exhibit E; e) billing statements issued by PECO to the Debtor between December 1996 and January 1998, together with copies of the checks issued by the Debtor relating to such billing statements, Exhibits I, J, K and L. Also attached to the stipulation, and incorporated therein, are copies of portions of electric utility service tariffs approved by the Pennsylvania Public Utility Commission (the "PUC") for PECO, West Penn Power Company (trading as Allegheny Power), and Metropolitan Edison. Exhibits F, G and H.

The following additional facts, derived from the stipulation, attachments thereto, and affidavits submitted by the parties, are undisputed. By letter dated November 11, 1997 PECO advised the Debtor that its account had carried a past due balance "for some time now," and warned that if the account were not "brought up to date" and a "current status maintained," it would require the Debtor to post a $100,000 security deposit. By letter dated December 13, 1997 PECO again advised the Debtor of an arrears balance on the account. Noting that the payment history on the account is "very poor," PECO informed the Debtor that a $100,000 security deposit had been imposed on its account which was to be paid in full by December 23, 1997, the due date for the December billing statement. The letter further advised that if payment in full of $198,974.31 ($100,000 security deposit, arrears balance of $46,-601.12, and current monthly charges in the amount of $52,373.19) were not received by such date, it would petition the court for the appointment of a receiver. The first transfer, received by PECO on December 23, 1997, constituted the Debtor's payment of current PECO charges due for December, thereby bringing the account current.[2] Transfer two, received by PECO on January 13, 1998, constituted the Debtor's pay-ment of current PECO charges ten days prior to the due date of January 23, 1998. The Debtor filed its bankruptcy petition on the same date that PECO received the second transfer.

PECO argues that the ordinary course of business defense applies, indeed that it was designed to protect the type of payments at issue here, i.e., payments for routine recurring transactions such as monthly utility bills. More particularly, PECO argues that the payments were ordinary between the parties in that both transfers were for payment of utility service on or before the due date specified in the respective billing statements. PECO posits that such payments were made within the contractual terms between the parties (as defined by the PECO energy tariff approved by the PUC), and should therefore be considered ordinary as between the parties. Moreover, PECO contends that the timing of the payments was consistent with the parties' pre-preference period practice. In this regard, PECO asserts that during the pre-preference period, the Debtor paid timely—that is, before assessment of a late fee (late fee on past due account balances not assessed until five days after the due date) 37 out of 69 months for which records are available, or approximately 54% of the time. During the preference period, in contrast, the Debtor made five payments to PECO, two of which (those at issue here), or 40%, were timely. PECO also asserts that it did not take any unusual action or apply economic pressure outside of the ordinary course of the parties' dealings in seeking to collect the payments at issue. Rather, while timely payments were the norm, at times when the Debtor's account would fall into arrears, PECO contends that it would routinely send the Debtor a reminder letter and/or contact the Debtor by telephone to attempt to collect payment. The Debt-

---

2. On or about December 11, 1997, the Debtor issued a payment to PECO in the amount of $45,687.37 which was credited to its account on December 16, 1997, and appears to have erased the arrears balance. This payment, one of five made to PECO during the preference period, has not been challenged by the Debtor as part of this adversary proceeding.

or's account was always brought current thereafter. PECO also contends that it was not aware that the Debtor was experiencing financial difficulties or facing the prospect of bankruptcy at the time it sought to collect the payments at issue, and thus did not seek to advantage itself to the detriment of other creditors.

As to the requirements of Code § 547(c)(2)(C), PECO argues that the transfers at issue were made in a manner consistent with the ordinary terms of credit within the utility industry as authorized under its tariff and demonstrated through the uncontested affidavit of its expert Robert A. Stilwell.

Finally, PECO argues that policy considerations underlying the ordinary course of business exception support the insulation of the transfers from avoidance as preferences in that it did not unfairly overreach, impel insolvency or inequitably advantage itself at the expense of other creditors.

In response, the Debtor argues that the payments resulted from extraordinary actions taken by PECO that fell outside the scope of parties' usual financial relations. First, the Debtor contends that the first and only time PECO took the step of threatening to seek a receiver occurred during the preference period. In the same vein, the Debtor assets that apart from when service was first initiated, PECO had never before required the Debtor to post a security deposit despite numerous occasions in the past when the Debtor's account was past due. Both of these actions, the Debtor contends, fall outside the scope of the parties normal financial dealings, and resulted in the Debtor issuing the payments in question sooner than it otherwise would have. The Debtor posits that the uncontested affidavit of Jeffrey L. Zot-

ter (the Debtor's Chief Financial Officer) confirms that the Debtor issued the payments as quickly as it did because it could not afford to post a $100,000 security deposit, and it feared that news of the appointment of a receiver would be detrimental to its business.[3] Zotter Affidavit, at ¶ 11. The Debtor also calls into question PECO's use of 69 non-consecutive months to establish pre-preference period payment history. More relevant, the Debtor contends, are records for the ten consecutive months preceding the preference period during which payments were issued by the Debtor on average 27 days after the invoice date. The Debtor also points out that during the preference period, the three payments preceding the payments in question were issued 48, 43, and 36 days, respectively, after the invoice date. The Debtor argues that the second transfer was not made in the ordinary course because it was the result of pre-bankruptcy planning on the part of the Debtor thus removing it from the purview of the exception. According to Zotter, the Debtor coordinated the time of the payment, and paid by cashier's check, with the intent of having a zero balance on its PECO account when the petition was filed so as to avoid having to post a large security deposit to PECO post-petition. The Debtor also contends that PECO failed to satisfy its burden with respect to the third element of the ordinary course of business defense. The crux of the Debtor's argument on this point is that regardless of whether the measures employed by PECO in this case, *i.e.*, demand for a security deposit and for appointment of a receiver, are authorized under its tariff, such measures are so infrequently employed by PECO with respect to its pool of commer-

---

**3.** In his affidavit Zotter stated that he was fearful that the publicity associated with proceedings seeking appointment of a receiver could have disastrous results for [the Debtor] and its residents, and could severely jeopardize its business. Such publicity could have a grave impact on [the Debtor],

with the likely result of residents demanding back the large security deposits that they deposited in connection with their residency and prospective new residents not entering into new contracts to commence residency at the facility.
Zotter Affidavit, at ¶ 11.

cial accounts as to not be considered ordinary within the industry.

## DISCUSSION

The instant motions are governed by Fed.R.Civ.P. 56, applicable here pursuant to Fed.R.Bankr.P. 7056. In pertinent part, Rule 56 provides that summary judgment should be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The parties agree that there are no material questions of fact and that the only issue before the Court, whether the requirements of § 547(c)(2)(B) and (C) of the ordinary course of business exception have been met, can be determined as a matter of law. As discussed *supra*, above, PECO bears the burden of proof on both of these elements by a preponderance of the evidence. Code § 547(g).

To satisfy its burden under § 547(c)(2)(B), PECO must prove that the transfers at issue were made in the "ordinary course of business or financial affairs of the debtor and transferee." Code § 547(c)(2)(B). Stated more plainly, PECO must prove that the challenged transfers were ordinary as between the parties.

■ The term "ordinary" as used in this context is not defined in the Code. Decisions of the Third Circuit Court of Appeals, however, instruct that the determination of "ordinariness" as between the parties is a subjective inquiry. *See In re First Jersey Securities, Inc.*, 180 F.3d 504, 512 (3d Cir.1999); *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d at 66. Factors such as the timing, amount and manner in which a transaction was paid are considered relevant. *In re First Jersey Securities, Inc.*, 180 F.3d at 512 (citing *In re Yurika Foods Corp.*, 888 F.2d 42, 45

(6th Cir.1989)). Courts have also considered the following as relevant criteria:

(1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition.

*In re Parkline Corp.*, 185 B.R. 164, 169 (Bankr.D.N.J.1994); *see also, In re R.M.L., Inc.*, 195 B.R. 602, 612 (Bankr. M.D.Pa.1996); *In re Richardson*, 94 B.R. 56, 59 (Bankr.E.D.Pa.1988).

■ Employing the foregoing criteria to the case at bar the Court concludes that PECO failed to establish that the payments in issue were made in the ordinary course of business between these parties. PECO attempted to show that the payments were ordinary in that their timing was generally consistent with the Debtor's pre-preference period payment history. In this regard, PECO asserts that its available records show that the Debtor paid current monthly charges "on time," that is, before the assessment of a late charge approximately 54% of the time during the pre-preference period. PECO contends that this compares favorably to the timing of payments made during the preference period, during which the Debtor made timely payments 40% of the time.

However, an examination of the payment history closer in time to the filing date of the petition reveals a vastly different picture than the one painted by PECO. During the ten months immediately preceding the preference period, the Debtor failed to make a single timely payment to PECO. Thus, during this period of time, the percentage of the Debtor's payments that were timely was zero, contrasted to a timeliness rate of 54% under the PECO

model which utilized 69 non-consecutive months preceding the preference period. Moreover, the only timely payments made by the Debtor during the twelve months before filing its petition were the two payments at issue herein, made during the preference period and, as discussed more fully below, only after PECO had stepped up the pressure on the Debtor to pay utilizing means not previously employed during their lengthy business relationship. Thus, contrary to the situation portrayed by PECO, during the time preceding the preference period, late payments from the Debtor were the norm, and the two timely payments at issue here were the exception.

Moreover, the circumstances under which these payment were made wholly undermines PECO's contention that the payments were made in the ordinary course of business. It is undisputed that at no time in the parties' nearly 15 year pre-bankruptcy business relationship had PECO threatened to seek appointment of a receiver due to non-payment, nor had it required the Debtor to post a security deposit, save for a deposit required when electric utility service was first established. The uncontested affidavit of Zotter explains that the timing of the December payment was in direct response to the foregoing collection measures employed by PECO. Zotter asserted that the payment was issued sooner than the Debtor would have normally done so because it could not afford to post a $100,000 security deposit,

and also out of concern that publicity surrounding a receivership proceeding would harm its business. *See* discussion and note 3, *supra*. By bringing the account current and paying the December statement on time the Debtor hoped to avoid these consequences.

The Court also observes that the timing and manner in which the second payment was made support a finding that this payment, too, was not made in the ordinary course. Although the fact that the second payment was made by cashier's check is not itself sufficient to take the payment outside the ordinary course of business, *see In re Continental Energy Associates L.P.*, 228 B.R. 96, 99 (Bankr.M.D.Pa.1998), *In re Tulsa Litho Co.*, 229 B.R. 806, 810 (10th Cir. BAP 1999), it is nonetheless a factor which the Court may consider.[4] Here, the uncontested affidavit of Zotter establishes that the payment was made by cashier's check on the same day that the petition was filed with the express purpose of zeroing out the Debtor's account balance as of the petition date so as to avoid having to post a large post-petition security deposit. The Debtor contends that since this payment was the result of pre-bankruptcy planning, it is by definition not made in the ordinary course of business. While this issue may not be as clear cut as the Debtor contends, *see In re Speco Corp.*, 218 B.R. 390, 401 (Bankr.S.D.Ohio 1998)[5] the Court need not decide this pre-

---

4. In determining whether payment by cashier's check lies outside the ordinary course of business courts have considered whether: (1) the debtor had not previously paid by cashier's check; (2) a significant number of payments were overdue; (3) payments were made after the Debtor stopped doing business with the creditor and after the Debtor ceased operations; (4) the payment was induced by the creditor's request for assurance of payments; and, (5) another creditor was attempting to push the debtor into bankruptcy. *Continental Energy Associates, L.P.*, 228 B.R. at 99 (citing *In re Craig Oil Co.*, 785 F.2d 1563, 1568 (11th Cir.1986); *Matter of Sims Office Supply, Inc.*, 94 B.R. 744, 749 (Bankr. M.D.Fla.1988)).

5. In its memorandum the Debtor cites *First Federal of Michigan v. Barrow*, 878 F.2d 912, 918 (6th Cir.1989) for the proposition that payments are not in the ordinary course of business when they are part of pre-bankruptcy planning. The *Speco* court, in commenting on *Barrow* noted that the Court of Appeals in that case did not hold that pre-bankruptcy planning negated an ordinary course of business defenses but only mentioned the phrase pre-bankruptcy planning in describing *In re Colonial Discount Corp.*, 807 F.2d 594 (7th Cir.1986), *cert. denied sub nom. Octopi, Inc. v. Courtney*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987). The court determined that *Colonial Discount*, stands only for the proposition that a debtor's state of mind, when combined with unusual collection prac-

cise issue since it readily concludes from the evidence presented that had the second (i.e., the January 12, 1998) payment truly been made in the ordinary course of business, it would not have been paid prior to the due date, as payment by the Debtor throughout the parties near 15 year business relationship had never before been earlier than the due date. Rather, payment in the ordinary course of business would have meant payment after the due date. Since the Debtor had filed its petition on January 13, 1998, any balance due on the account at that point for pre-petition services would have given rise to an unsecured claim in favor of PECO in the amount of such balance. The Debtor prevented this from happening by departing from custom and paying PECO, a potential creditor, ahead of the time it normally would have. Under the facts of the case, such a payment was clearly not in the ordinary course of business between these parties. PECO has offered nothing to refute this.

Based upon the foregoing, the Court concludes that PECO has failed to carry its burden with respect its assertion of a defense under Code § 547(c)(2)(B). Since PECO must satisfy all three of the requirements of § 547(c)(2) in order to insulate the payments from avoidance under the exception, it is not necessary for the Court to consider whether the requirements of § 547(c)(2)(C) have been met here. Accordingly, the two payments at issue, $53,286.94, and $61,737.54, are declared avoidable as preferences under Code § 547(b).

As a final matter the parties have stipulated that in the event the Court were to reach the conclusion that the ordinary course of business defense applied to neither payment, PECO would be entitled to a credit for subsequent new value in the amount of $37,892.10 under Code § 547(c)(1), thereby reducing its total lia-

bility to the Debtor to $77,132.38. Judgment shall be entered in favor of the Debtor, and against PECO, accordingly. Finally, the parties stipulated that in the event of a ruling adverse to it, PECO would be entitled to an allowed unsecured claim in a like amount under Class 13 of the Debtor's Amended Liquidating Plan of Reorganization.

tices on behalf a creditor, may combine to provide evidence that payments are not made in the ordinary course of business. *Speco*,

218 B.R. at 401 (citing *In re Colonial Discount Corp.*, 807 F.2d at 600; *In re Craig Oil Co.*, 785 F.2d at 1566).