NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-1794
_____

In re: AE LIQUIDATION, INC., f/k/a Eclipse Aviation Corporation, et al,
Debtors

JEOFFREY L. BURTCH, Chapter 7 Trustee

v.

PRUDENTIAL REAL ESTATE & RELOCATION SERVICES, INC.;
PRUDENTIAL RELOCATION, INC.,
Appellants
_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1-16-cv-00252)
District Judge: Honorable Leonard P. Stark
_____

Submitted Under Third Circuit LAR 34.1(a)
January 12, 2018

Before: JORDAN, ROTH, *Circuit Judges* and MARIANI[*], *District Judge.*

(Filed: May 4, 2018)

_____

[*] Honorable Robert D. Mariani, United States District Court Judge for the Middle District of Pennsylvania, sitting by designation.

_____

OPINION**

_____

MARIANI, *District Judge.*

Creditors Prudential Real Estate and Relocation Services, Inc. and Prudential Relocation, Inc. (collectively "Prudential") appeal from a decision arising from the bankruptcy proceeding of AE Liquidation, Inc., f/k/a Eclipse Aviation Corporation ("Eclipse"). Prudential appeals two orders of the District Court of Delaware, which affirmed the Bankruptcy Court's decision to (1) deem payments made to Prudential during the Preference Period as outside the ordinary course of business under 11 U.S.C. § 547(c)(2)(A), and (2) reduce the amount of Prudential's new value defense under 11 U.S.C. § 547(c)(4). We will affirm.

## I.    Background

Prudential is a company that provides relocation benefits to its clients' employees. **[App. at 262-263.]** On May 1, 2006, Prudential and Eclipse entered into a contract called the Relocation Services Agreement (the "Agreement"), in which Prudential agreed to provide various relocation services for Eclipse's employees. **[App. at 2481-2509.]** Under the Agreement, Eclipse was to pay for Prudential's services within 30 days of each invoice issued by Prudential. **[App. at 2495.]**

---

** This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

From 2006 to the summer of 2007, Prudential did not encounter any problems in its relationship with Eclipse. **[App. at 276.]** However, from the summer of 2007 onwards, Eclipse began to fall behind on its payment of invoices from Prudential. **[App. at 276.]** By November 2007, Eclipse owed $1.7 million to Prudential in accounts receivable that were over 60 days old. **[App. at 276.]** In response, Prudential imposed special measures to reduce the accounts receivable, such as requiring a payment plan of approximately $200,000 per week and requiring Eclipse to pay off a lump sum of approximately $900,000 by December 2007. **[App. at 276-277.]** The Bankruptcy Court referred to these measures as the "First Payment Plan." (App. at 2.) In addition to these measures, Prudential put Eclipse on billing review, which was described by a Prudential witness as a procedure in which Prudential does not "accept[] any new business [from the client], and everything is monitored before we move forward." (App. at 276.) From November 26, 2007 to January 2008, Eclipse made weekly payments of approximately $200,000 under the new payment plan, as well as a lump sum payment of approximately $900,000 on January 4, 2008. **[App. at 277-279.]** As a result of Eclipse reducing its accounts receivable, Prudential took Eclipse off of billing review around mid to late January. **[App. at 286.]** However, Eclipse began "to fall back again in March of 2008." (App. at 286.)

On August 28, 2008, Eclipse's accounts receivable balance had grown to $800,000, approximately $600,000 of which was overdue. **[App. at 405.]** Around the same time, Prudential learned that Eclipse had discharged approximately 650 employees and instructed those employees to submit certain pending relocation expenses to

3

Prudential for reimbursement. **[App. at 313.]** Prudential also learned directly from Eclipse that Eclipse would be conserving its cash for the next 8 to 12 weeks. **[App. at 1177.]** Prudential employees discussed the situation in numerous internal emails in the weeks following August 28, 2008. **[App. at 1175-79, 1187-89.]** Prudential decided to put Eclipse back on billing review. **[App. at 288.]** In addition, Prudential put Eclipse on a new payment plan that required a weekly payment of $50,000 and requested a lump sum payment in full from Eclipse. **[App. at 289-290.]** The Bankruptcy Court referred to the new weekly payment plan and lump sum request as the "Second Payment Plan." **[App. at 3-4.]**

Eclipse filed its bankruptcy petition on November 25, 2008. **[App. at 4.]** Within the 90 days preceding the petition date (the "Preference Period"), Eclipse made twelve payments to Prudential totaling $781,702.61. **[App. at 489.]** These payments included five payments made in September 2008 of approximately $50,000 each, pursuant to the Second Payment Plan. **[App. at 489.]** On September 24, 2008, Prudential requested an increase of the weekly payments to $75,000. **[App. at 338-339.]** When Prudential did not hear back from Eclipse, it emailed Eclipse again on September 30, 2008 stating: "[i]t is critical that we receive a response to our request to increase the weekly payments or to bring the account current. If we do not receive a response by close of business tomorrow, 10/1/08, Prudential will need to re-evaluate our options, up to and including termination." (App. at 1648.) That same day, Eclipse agreed to pay $75,000 a week. **[App. at 1645.]** The Bankruptcy Court defined this increased payment plan as the "Amended Payment Plan." **[App. at 4.]** In addition to the Amended Payment Plan, Prudential also began

4

sending a weekly billing summary to Eclipse and required payment in full based on the summary; Prudential only issued the complete invoice to Eclipse after Eclipse paid in full the charges on the summary. **[App. at 358-359.]** This procedure had never been imposed by Prudential before the Preference Period. **[App. at 353.]** In October and November of 2008, Eclipse made seven more payments of approximately $75,000 each to Prudential. **[App. at 489.]** In its appeal, Prudential argues that these twelve payments made during the Preference Period were in the ordinary course of business and therefore were not preferential transfers under 11 U.S.C. § 547(c)(2). **[Opening Br. at 14-24.]**

Separately, Prudential appeals the Bankruptcy Court's order on remand reducing its new value defense. **[Opening Br. at 24-26.]** In the original proceeding before the Bankruptcy Court, Prudential asserted two defenses: "(i) that the Transfers were made in the ordinary course of business under section 547(c)(2), and (ii) that Prudential gave new value after the Transfers to or for the benefit of Eclipse under section 547(c)(4)." (App. at 9.) With respect to the second defense, the parties agreed at the outset "that new value exist[ed] and only dispute the amount." (App. at 26.) In its initial opinion, the Bankruptcy Court agreed with Prudential's argument that it is entitled to a new value defense of $128,379.40, based on evidence that Prudential provided new services rendered during and after the Preference Period totaling that amount. **[App. at 25-28.]** On September 10, 2015, the District Court of Delaware affirmed the Bankruptcy Court's ruling on the ordinary course of business issue, but remanded on the new value issue. **[App. at 76-88.]** Citing this Court's reasoning in *In re Friedman's Inc.*, 738 F.3d 547 (3d Cir. 2013), the District Court noted that "only services provided prior to the petition

5

date [should be] included in the § 547(c)(4) new value defense." (App. at 86.) Because the Bankruptcy Court's original opinion "[did] not distinguish between pre-petition and post-petition payments for the purpose of calculating Prudential's new value defense," the District Court directed the Bankruptcy Court to recalculate the new value defense. (App. at 86.) On remand, the Bankruptcy Court reduced the value of Prudential's new value defense to $56,571.37, consistent with the District Court's ruling that services rendered after the petition date should not be taken into account in calculating the new value defense (the "Remand Order"). **[App. at 95.]** On March 30, 2017, the District Court affirmed the Bankruptcy Court's Remand Order. **[App. at 101.]** Prudential argues that the Bankruptcy Court erred in its decision on remand, because the Court denied Prudential's request to reopen the record before proceeding with the recalculation of the new value defense. **[Opening Br. at 25-26.]** Upon review of this appeal, we will affirm on both issues.

## II.     Discussion[1]

### A.     The Ordinary Course of Business Defense

---

[1] The District Court had jurisdiction over the appeal of the Bankruptcy Court's orders pursuant to 28 U.S.C. § 158(a)(1). We have jurisdiction to review the District Court's decision pursuant to 28 U.S.C. § 158(d)(1). "Our review of the District Court's decision effectively amounts to review of the bankruptcy court's opinion in the first instance," *In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 224 (3d Cir. 2002), because our standard of review is "the same as that exercised by the District Court over the decision of the Bankruptcy Court," *In re Schick*, 418 F.3d 321, 323 (3d Cir. 2005).

We review the Bankruptcy Court's findings of fact for clear error and exercise plenary review over questions of law. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 209-10 (3d Cir. 2006).

6

We agree with the Bankruptcy Court's analysis and conclusion that Prudential failed to prove that the twelve payments made in the Preference Period fell within the ordinary course business affirmative defense under 11 U.S.C. § 547(c)(2). That provision states:

> (c) The trustee may not avoid under this section a transfer—
> …
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> (B) made according to ordinary business terms.

"Neither 'ordinary course of business' nor 'ordinary business terms' is defined in the Bankruptcy Code." *In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568, 576 (3d Cir. 2007) (citing *In re J.P. Fyfe, Inc.*, 891 F.2d 66, 70 (3d Cir. 1989)). "[O]rdinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships." *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 227 (3d Cir. 1994). In determining whether payments are made in the "ordinary" course of the parties' business, "each fact pattern must be examined to assess 'ordinariness' in the context of the relationship of the parties over time." *Id.* at 576-77.

In its original opinion, the Bankruptcy Court concluded that Prudential had not established an ordinary course of business defense, because its collection efforts during the Preference Period, namely the Second Payment Plan and the Amended Payment Plan, were not reflective of the parties' dealings in the ordinary course of business. **[App. at 25.]** Prudential takes issue with the Bankruptcy Court's conclusion, arguing that the

7

twelve transfers were only paid "nineteen days faster during the Preference Period," which was within the normal range of the historical relationship between Prudential and Eclipse, and that there is no need to require "absolute uniformity" in payment frequency between the Preference Period and the pre-Preference Period. (Opening Br. at 15.)

However, while Prudential is correct that no absolute consistency is required, the fact that payments to Prudential were made nineteen days faster during the Preference Period was only one of several salient facts considered by the Bankruptcy Court. In this case, the parties had an original agreement in which Eclipse was to pay Prudential for its services within 30 days of each invoice. **[App. at 2495.]** That term was changed by Prudential when it requested a faster payment term, i.e. weekly payments instead of monthly payments, and a lump sum payment *in full* during the Preference Period. **[App. at 289-290.]** The Bankruptcy Court properly found the faster payment rate to be "significant," in light of the fact that Prudential only "insisted on a quicker payment schedule as it became aware of Eclipse's financial troubles." (App. at 16.)

The relationship between Prudential and Eclipse became more financially stable after the First Payment Plan. **[App. at 361-362.]** However, as of the start of the Preference Period, the relationship took a turn for the worse. On August 28, 2008, Prudential learned that Eclipse had discharged approximately 650 employees and instructed them to submit pending relocation expenses to Prudential, and separately learned that Eclipse would be conserving its cash for the following 8 to 12 weeks. **[App. at 313, 1177.]** After learning of these changes, Prudential implemented the Second Payment Plan which required a $50,000 payment every week and requested a lump sum

8

payment in full from Eclipse. **[App. at 289-290.]** Additionally, a month after initiating the Second Payment Plan, Prudential issued an ultimatum to Eclipse via email: acquiesce to Prudential's request to either increase the weekly payment plan to $75,000 per week or "bring the account current," and, if Prudential did not receive a response by the next day, it would consider terminating the parties' relationship. (App. at 1648.)

The Bankruptcy Court properly found that "Prudential's threatening Eclipse into making increased payments to bring the [accounts receivable] current during the Preference Period was not in the ordinary course of business," since "[t]his type of ultimatum never occurred in the pre-Preference Period (even in connection with the First Payment Plan)." (App. at 19-20.) The Bankruptcy Court also found that a $75,000 required weekly payment, which was imposed during the Preference Period, was "significantly different from the original credit terms" of the parties' relationship, which only required payment within 30 days of invoice. (App. at 24.) Furthermore, Prudential's own internal emails revealed a concern about Eclipse's liquidity, with a Prudential employee commenting that "[Eclipse is] in financial instability and [we are] very concerned about our exposure. … [L]ast year they also hit hard times with us but eventually got caught up after we cut them off, though that nearly ended our relationship with them." (App. at 1178.)

In other words, the Bankruptcy Court did not consider the faster payment rate in isolation. Rather, it considered the nineteen day difference in the context of the parties' relationship, similarity of transactions, the manner in which payment was tendered, Prudential's new and unusual collection efforts during the Preference Period, and

9

Prudential's actions after learning of Eclipse's financial hardship.  **[App. at 12-25.]**  We agree with the Bankruptcy Court's analysis that, taken as a whole, Prudential's conduct in the Preference Period deviated from the parties' ordinary course of business practices. *Cf. In re Hechinger Inv.*, 489 F.3d at 578 (noting that the Bankruptcy Court "properly considered" factors such as "the length of time the parties had engaged in the type of dealing at issue, the way the payments were made, whether there appeared to be any unusual action by either the debtor or creditor to collect or pay on the debt, and whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition") (citing *In re Logan Square E.*, 254 B.R. 850, 855 (Bankr. E.D. Pa. 2000)).

Prudential also argues that the Second Payment Plan did not constitute unusual business practice because it bore similarities to the First Payment Plan.  **[Opening Br. at 21-24.]**  However, that argument is unpersuasive.  As discussed above, the Bankruptcy Court based its ruling in part on the email ultimatum Prudential issued to Eclipse in September 2008, which "never occurred in the pre-Preference Period (even in connection with the First Payment Plan)."  (App. at 19-20.)  Furthermore, we agree with the Bankruptcy Court's reasoning that "the fact that Eclipse was placed on a similar accelerated payment plan for three months at sometime in the past does not make the payment plans ordinary. … The First Payment Plan and the Second Payment Plan were not simply a renegotiation of the contract, they were unilateral pressure [tactics] by Prudential on Eclipse to assure future payment."  (App. at 24-25.)  Thus, the Bankruptcy Court did not err in finding that payments made pursuant to Prudential's collection efforts

10

during the Preference Period were outside the parties' ordinary course of business practices.

B.     New Value Defense

Prudential also argues that the Bankruptcy Court erred in denying a request to reopen the record before the Court ruled on the new value issue on remand. **[Opening Br. at 25-26.]** A new value defense "allows a creditor to retain an otherwise voidable preference if the creditor gave the debtor new value after the preferential transfer." *In re New York City Shoes, Inc.*, 880 F.2d 679, 679 (3d Cir. 1989) (citing 11 U.S.C. § 547(c)(4)). In its original opinion, the Bankruptcy Court relied on the testimony of Rene Williams-Varner, Prudential's Director of Accounting, and a new value analysis chart she created that detailed all "new services rendered during and after the Preference Period and the corresponding invoices…totaling $128,379.40." (App. at 26.) Crediting the Williams-Varner testimony and the new value analysis chart, the Bankruptcy Court "[found] that Prudential ha[d] a new value defense in the amount of $128,379.40." (App. at 28.) On September 10, 2015, the District Court remanded for a recalculation of the new value defense because "only services provided prior to the petition date [should be] included in the § 547(c)(4) new value defense." (App. at 86.) Because the Bankruptcy Court's original opinion "[did] not distinguish between pre-petition and post-petition payments," the District Court instructed the Bankruptcy Court to "reexamine those invoices to determine the appropriate amount of Prudential's new value defense." (App. at 86.)

Prudential argues that on remand, the Bankruptcy Court erred by denying its request to reopen the factual record, which was necessary to clarify the record because Prudential was not given a chance to present more thorough testimony in the original proceeding. **[Opening Br. at 25.]** Prudential contends that in the original trial, the Bankruptcy Court "expressed its preference to not go through each individual invoice in detail" during Williams-Varner's testimony, and thus, Prudential had "to summarize the new value analysis without going through each individual invoice." (Opening Br. at 25.) However, there is no reason to believe that any *additional* evidence was necessary for the Bankruptcy Court to recalculate the new value defense on remand. In the original proceeding, there had been extensive testimony from Rene Williams-Varner regarding the services Prudential provided to Eclipse, which the Bankruptcy Court credited as "persuasive and uncontested." (App. at 27.) Prudential also introduced into evidence a new value analysis chart created by Williams-Varner, which included all invoices reflecting the value of new services it provided to Eclipse. **[App. at 2590-2652.]** The chart includes not only a summary of the invoices, but also detailed information from each invoice. **[App. at 2590-2652.]** Thus, there was no reason for the Bankruptcy Court to reopen the factual record when it had the Williams-Varner testimony and the new analysis chart at its disposal. The District Court's direction to the Bankruptcy Court on remand was simple and straightforward: the new calculation of Prudential's new value defense should not include the value of any services rendered by Prudential after the petition date. **[App. at 86.]** The sole issue on remand entailed applying the District Court's guidance to the dates and value of the invoices reflected in the new analysis

12

chart.  Thus, the Bankruptcy Court did not err in declining to reopen the factual record after remand from the District Court.

## III.    Conclusion

For the foregoing reasons, we will affirm the District Court's Orders affirming the Bankruptcy Court's ruling on the ordinary course of business defense and the District Court's order affirming the Bankruptcy Court's Remand Order reducing the new value defense to services rendered pre-petition.